IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
WACO DIVISION

| | | |
|---|---|---|
| TEXANS AGAINST HIGH-SPEED RAIL, INC., | § | |
| | § | |
| CALVIN HOUSE, RONNY CALDWELL, | § | |
| GENE and MICHAELLE WHITESIDES, | § | |
| DONOVAN MARETICK, RONALD and | § | |
| BECKY SCASTA, LOGAN WILSON II, | § | |
| DAVID and HEATHER MISELDINE, | § | |
| | § | |
| WALLER COUNTY, GRIMES COUNTY, | § | |
| MADISON COUNTY, LEON COUNTY, | § | |
| NAVARRO COUNTY, FREESTONE COUNTY, | § | |
| | § | |
| *Plaintiffs,* | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 6:21-cv-365 |
| | § | |
| U.S. DEPARTMENT OF TRANSPORTATION; | § | |
| PETE BUTTIGIEG, in his official capacity as | § | |
| Secretary of Transportation, | § | |
| | § | |
| FEDERAL RAILROAD ADMINISTRATION; | § | |
| RONALD BATORY, in his official capacity as | § | |
| Administrator, PAUL NISSENBAUM, in his | § | |
| official capacity as Associate Administrator, and | § | |
| QUINTIN KENDALL, in his official capacity as | § | |
| Deputy Administrator of the Federal Railroad | § | |
| Administration, | § | |
| | § | |
| *Defendants.* | § | |

---

## ORIGINAL COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

---

1.      Plaintiffs bring this action against the Federal Railroad Administration ("FRA") and U.S. Department of Transportation for declaratory and injunctive relief pursuant to the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-706, the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 *et seq.* and applicable regulations.

2.     At issue is a proposal by Texas Central Railroad ("Texas Central") to construct and operate a high-speed passenger rail ("HSR") system along a dedicated, fully sealed corridor between Dallas and Houston using Central Japan Railway Company's Tokaido Shinkansen HSR technology (the "Project"). By design, the proposed Shinkansen technology is not "interoperable" with any other existing transportation infrastructure, which simply means it cannot run on any other tracks and no other trains can run on its tracks. Thus, the Project would be totally incompatible with, and disconnected from, any existing or future rail lines.

3.     Texas Central wants approval (and billions in public funding) to construct and operate its "privately funded" Project, but the Shinkansen technology does not comply with existing safety regulations. As a result, Texas Central asked the FRA to carve out special safety rules so that it could use the Shinkansen technology here in the U.S., and FRA did just that. For the first time since its creation in 1966, FRA issued what is now known as a "Rule of Particular Applicability" ("RPA"), which establishes safety standards that "are not intended for general application" in the rail industry; rather, they apply only to the proposed Shinkansen technology.

4.     Plaintiffs have no quarrel with FRA establishing safety standards within its regulatory authorization. However, in the course of this challenged action, FRA did things and made choices that had little, if anything, to do with its ultimate agency action regarding "safety." At every stage, FRA unlawfully deviated from proper procedure and, in the process, violated bedrock principles under NEPA and the APA that exist to promote transparency, informed decision-making, and full and fair opportunity for comment by affected persons.

5.     FRA's unlawful action began in 2014 when it "scoped" an environmental impact statement ("EIS") to evaluate the impacts of constructing and operating the Project. NEPA requires an EIS for any major federal action significantly impacting the environment. At the time, FRA

referred to construction and operation of the Project as the "Proposed Action" requiring an EIS "pursuant to NEPA." It did not even mention safety or the RPA.

6. During the scoping process that followed, FRA and Texas Central promised the Project must be "economically viable" to meet its purpose. In fact, FRA double-weighted economic viability as a factor in assessing a set of nine proposed "alignments" between Dallas and Houston. FRA and Texas Central also promised the Project would be financed through "private funding sources" and require no public money.

7. As for the RPA, FRA mentioned it only in passing during scoping, as one of several regulatory actions it may consider at some point in the future. To ease any concerns, landowners were falsely told issuance of an RPA "is a routine process used by federal agencies to address new or unique situations."

8. FRA then began preparation of a draft environmental impact statement ("Draft EIS") that purported to evaluate the impacts of constructing and operating the Project along the only alignment (of nine) to survive scoping. At some point prior to release of the Draft EIS, however, Texas Central convinced FRA to remove economic viability from the Project's purpose. Despite this material change to the Project's purpose, FRA never reconsidered the eight alignments it had eliminated during scoping. Instead, FRA published its Draft EIS in 2017 (despite its deficiencies), sought and considered comments on the Draft EIS (which were ignored), and plowed forward with preparation of a final environmental impact statement ("Final EIS").

9. In March 2020—six years *after* FRA scoped an EIS to evaluate the impacts of constructing and operating the Project and more than two years *after* it published a Draft EIS purporting to evaluate these same impacts—FRA published a notice proposing "a rule of particular applicability (RPA) to establish safety standards for the [Texas Central] high speed rail system."

10.     In the notice, FRA claimed it had been "evaluating the potential environmental impacts that may result from this proposed rule" in accordance with NEPA. This was false. In its own words, FRA had purportedly been evaluating "the impacts of constructing and operating" the Project along a preferred alignment between Dallas and Houston. And, to reiterate, FRA's 2014 Notice of Intent to prepare an EIS did not even mention safety or the RPA.

11.     Two months later, in the Final EIS published in May 2020, FRA claimed: "This document evaluates … the potential beneficial and adverse environmental impacts of FRA's proposed [RPA] to enable effective safety oversight of the operation of a [HSR] system based on the [Shinkansen] technology." This was also false.

12.     Admittedly, FRA did not evaluate the impacts of the RPA in the Draft EIS. It did not seek or consider comments related to any such impacts either. As a result, FRA could not have evaluated the impacts of the RPA for inclusion in the Final EIS in a mere two months, from scratch. And its content bears this out. FRA dedicated the near entirety of the 11,512-page Final EIS to a purported evaluation of "Build Alternatives." The Final EIS, like the Draft EIS before it, mentioned the RPA just once and only in passing.

13.     To be clear, FRA *never* prepared an EIS to evaluate the impacts that may result from the RPA, as required by NEPA. On this basis alone, the RPA must be vacated and set aside. But the story of FRA's bizarre and unlawful conduct unfortunately does not end there.

14.     In November 2020, FRA issued the RPA itself, along with a Record of Decision ("ROD") approving both the RPA and the Final EIS. However, FRA stressed that the RPA does not grant *any* kind of approval to construct or operate the Project. This express disclaimer was initially confusing, to say the least, given that FRA had both scoped an EIS and prepared a Draft EIS and Final EIS to evaluate the impacts of constructing and operating the Project.

15. But in July 2020—four months prior to FRA's issuance of the RPA—the Surface Transportation Board ("STB"), the federal agency that oversees construction and acquisition of federally regulated rail lines, asserted jurisdiction over the Project and denied Texas Central's request to bypass the full application process required of new rail lines. In its decision, the STB made clear that Texas Central cannot begin *any* construction or operation of the Project unless and until a full application (which Texas Central has yet to file) is approved by the STB.

16. After the STB properly asserted its jurisdiction and authority over the Project, FRA apparently came to the conclusion that it did not have authority to approve construction or operation of the Project in the first place. That is precisely why it had no choice but to ultimately admit it lacked such authority, and disclaim such approval, in the RPA. By acting for years under the guise of jurisdiction and authority it did not have, FRA exceeded its jurisdiction and authority and violated Plaintiffs' constitutional rights, which the APA expressly forbids.

17. Setting aside the fact that FRA scoped an EIS for one purpose then issued its final agency action (the RPA) for an entirely different purpose, the Final EIS violates NEPA as a standalone document in a number of ways. With its actual effort at analysis entirely unmoored to lawful authority, proper scope and purpose, or sensible science, FRA whiffed on virtually every critical analytic point. FRA did things and reached conclusions that are, plainly, wrong, and its Final EIS would not pass muster even if conducted by an empowered agency.

18. Yet, FRA portrays the Final EIS as if it could somehow validate the deployment of the Shinkansen technology "independent of location," meaning anywhere in the U.S. FRA makes this quantum leap even though it scoped its EIS to evaluate the impacts that may result from construction and operation of the Project (not from the RPA), and confined its purported evaluation of these impacts to a preferred alignment between Dallas and Houston (not anywhere in the U.S.).

19.     And although it expressly disclaimed approval to construct or operate the Project, FRA contends that its manifestly deficient-but-completed Final EIS is much like a loaded weapon: it can be picked up and fired at any time to deploy the Shinkansen technology "in any location" in the U.S. It must therefore be challenged now—before it is fired—to prevent it from being used for a purpose FRA actually has disclaimed and to avoid any risk it may not be challengeable later.

20.     In truth, there is no need to sift through the 77-page, highly-technical RPA or the tens of thousands of pages of EIS documents to figure out what is really going on here. Central Japan Railway desperately wants a rule allowing it to deploy its incompatible Shinkansen technology anywhere in the U.S., and it wants that rule to apply exclusively to its technology. The term "monopoly" may not be a perfect fit, but certainly comes to mind.

21.     Armed with a $300 million loan from the Japanese government, Texas Central and its legion of consultants were chosen to carry Central Japan Railway's water.[1] FRA was chosen as the willing federal agency conduit. And the thousands of impacted rural landowners who have been told lie after lie after lie about the Project for years were chosen to be the sacrificial lambs.

22.     To Texas Central and Central Japan Railway (and FRA), it does not matter whether the Project is economically viable. That much has been made clear. Nor does it matter how much the Project will cost. Nor does it matter whether Texas Central's absurd, grossly exaggerated ridership projections could ever be achieved. When this $30+ billion Project hemorrhages hundreds of millions of dollars from day one, so be it, since taxpayers will now be footing the bill.

23.     Perhaps the most confounding (and disappointing) fact pervading this colossal mess and waste of resources is that FRA had no good reason to do what it did. There are many HSR

---

[1] *Equity Participation for the development of High-Speed Railway Project in Texas, United States: Supporting Export of Japan's Shinkansen System*, JAPAN BANK OF INTERNATIONAL COOPERATION (Sep. 10, 2018), https://www.jbic.go.jp/en/information/press/press-2018/0910-011388.html.

alternatives that could connect to and strengthen the national rail network, and that would result in far fewer environmental impacts. Instead of evaluating *all* reasonable alternatives, as NEPA requires, FRA deferred to Texas Central as to the range of alternatives to be considered and scope of environmental analysis to be conducted. FRA then misused the NEPA process to eliminate reasonable alternatives and either glossed over potential impacts or ignored them altogether.

24.     Before putting any pen to paper, FRA had already made up its mind about what it was going to do and simply did it. Throughout the process, and likely related to having acted so far outside its lawful mission, FRA made inexplicable and irrational decisions while running roughshod over NEPA's procedural requirements, the APA's constraint on arbitrary and capricious decision-making, and Texans' private property rights. FRA merely papered the file in an attempt to justify decisions that had already been made.

25.     There are also serious concerns surrounding Texas Central, a woefully undercapitalized company with no experience financing, constructing, or operating *any* rail line, let alone an HSR. If construction starts but cannot be completed or the Project collapses after operations commence, miles and miles of the rural Texas environment will be scarred with a useless, hulking, rusting piece of iron. The Court need only look to the ongoing high-speed rail disaster in California, where two-thirds of the project has essentially been abandoned while costs have ballooned from $33 billion to over $100 billion, to grasp the full extent of environmental and economic destruction on the horizon. If built, this Project will be a financial albatross around the necks of victimized taxpayers, none of whom voted in its favor, at great environmental expense.

26.     As spelled out in this Complaint, Defendants acted unlawfully, rendering their decision to issue the ROD approving the RPA a violation of NEPA and the APA, arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law. Among other relief,

Plaintiffs request an order vacating and setting aside the ROD and RPA, declaring the ROD and RPA void for all purposes, and enjoining any use of the ROD, RPA or Final EIS for any purpose.

JURISDICTION

27.     This action arises under NEPA, 42 U.S.C. § 4321 *et. seq*., and its implementing regulations, particularly those of the Council on Environmental Quality ("CEQ") found at 40 C.F.R. § 1500 *et seq*. Judicial review is sought pursuant to the APA, 5 U.S.C. §§ 701–706. This Court has jurisdiction over the case pursuant to 28 U.S.C. § 1331 (Federal Question Jurisdiction). This Court can grant declaratory and injunctive relief under 28 U.S.C. § 2201 (declaratory judgment), 28 U.S.C. § 2202 (injunctive relief), and 5 U.S.C. §§ 552, 701–706, for violations of, inter alia, the APA and NEPA.

**VENUE**

28.     Venue is proper in this district under 28 U.S.C. § 1391(b) because a substantial part of the events and omissions giving rise to Plaintiffs' claims occurred in this district and the location of the property where the Project is to take place is located within this district.

**PLAINTIFFS**

**Texans Against High-Speed Rail.**

29.     Texans Against High-Speed Rail, Inc. ("TAHSR") has significant interests at stake in this litigation and, as detailed below, TAHSR has standing to seek redress of the specific concrete injuries it will suffer.

30.     TAHSR is an Internal Revenue Code 501(c)(4) organization formed for the purpose of protecting the environment along the Project's affected corridor through preservation of farmland, enhancement of wildlife, protection of waters, wetlands, and endangered and protected species, and recognition and enhancement of the rural lifestyle. TAHSR also seeks to combat eminent domain abuse for private economic gain, prevent unnecessary government subsidies, and

maintain efficient modes of transportation. TAHSR strives to meet the purposes for which it was formed through litigation and other lawful means.

32. TAHSR's members include citizens, landowners, farmers, ranchers, business owners, interested organizations, and elected officials who share TAHSR's core beliefs and are committed to the purposes for which TAHSR was formed. The vast majority of TAHSR's members live and recreate directly along or in very close proximity to the Project's proposed route.

32. TAHSR represents the interests of its members who live, work, and recreate in the immediate and general vicinity of the Project, and who have an ongoing interest in protecting the farmland, wildlife, waters, wetlands, and endangered and protected species along the Project's proposed route. TAHSR also represents the interests of its members who have property, human health, and aesthetic interests that will be impacted by the Project. Such members are also concerned that the visual, air quality, and noise impacts associated with the Project—a high-speed train whizzing back and forth at speeds over 200 mph—will negatively impact their day-to-day lives and long-term conservation interests. TAHSR's members are further concerned that construction and operation of the Project will increase flooding risks on and near their property.

33. TAHSR brings this suit on behalf of itself and its members. TAHSR and its members seek to preserve the environmental, recreational, cultural, and historic integrity and aesthetic value of the land Defendants (and Texas Central) are proposing to turn into a high-speed rail line. TAHSR's members would have standing to sue on their own behalf, and the interests at issue are germane to TAHSR's mission. As members of the communities in which the Project will be constructed, TAHSR and its members will be adversely impacted by the Project and directly injured by Defendants' final agency action. TAHSR and its members believe that there are more

cost effective and less environmentally damaging ways to address the purported traffic congestion along I-45 that have been pushed aside in favor of this politically influenced project.

34.     TAHSR and its members have been actively opposed to the Project. TAHSR has brought and participated in lawsuits and other proceedings involving Texas Central and its Project to, among other purposes, preserve the farmland, wildlife, waters, wetlands, endangered and protected species, and rural lifestyle along the Project's affected corridor. TAHSR has also worked in non-litigation settings to protect farmland, wildlife, waters, wetlands, and endangered and protected species along the Project's affected corridor.

35.     TAHSR and its members have actively monitored the Project and convened multiple meetings about the Project. TAHSR submitted substantial written comments during the NEPA process, identifying the major flaws in Defendants' proposed action and its EIS documents, and concerning the Project in general. TAHSR and its members are also directly harmed by the procedural failures alleged here, which have prevented them from fully participating in an open and public discussion of the Project as required by NEPA.

**Impacted landowners.**

36.     **Calvin House** is a member of TAHSR. He owns property in Harris County located at 15743 House Road, Hockley, Texas 77477 and will be directly and adversely impacted by the Project. He makes regular use and enjoyment of the public lands, wetlands, and waters near his property, all of which will be directly impacted by the Project. Mr. House attended scoping meetings and EIS public hearings and submitted comments regarding the relevant EIS documents. He will be irreparably harmed by construction of the Project, which will decrease the value and diminish his use and enjoyment of his property and surrounding areas. Mr. House lives near where the Project will be constructed and operated and would feel the environmental effects of the

Project, including effects to air and water quality, traffic flow, pollution, noise levels, emergency medical services, drainage, and flood control, among others. He has an interest in maintaining the integrity of the environment on and near his property.

37.     **Ronny Caldwell** is a member of TAHSR. He owns property in Ellis County located at 5640 FM 878, Palmer, Texas 75152 and will be directly and adversely impacted by the Project. He makes regular use and enjoyment of the public lands, wetlands, and waters near his property, all of which will be directly impacted by the Project. Mr. Caldwell attended scoping meetings and EIS public hearings and submitted comments regarding the relevant EIS documents. He will be irreparably harmed by construction of the Project, which will decrease the value and diminish his use and enjoyment of his property and surrounding areas. Mr. Caldwell lives near where the Project will be constructed and operated and would feel the environmental effects of the Project, including effects to air and water quality, traffic flow, pollution, noise levels, emergency medical services, drainage, and flood control, among others. He has an interest in maintaining the integrity of the environment on and near his property.

38.     **Gene and Michaelle Whitesides** are members of TAHSR. They own property in Madison County located at 8491 FM 978, Normangee, Texas 77871 and will be directly and adversely impacted by the Project. They make regular use and enjoyment of the public lands, wetlands, and waters near their property, all of which will be directly impacted by the Project. The Whitesides attended scoping meetings and EIS public hearings and submitted comments regarding the relevant EIS documents. They will be irreparably harmed by construction of the Project, which will decrease the value and diminish their use and enjoyment of their property and surrounding areas. The Whitesides lives near where the Project will be constructed and operated and would feel the environmental effects of the Project, including effects to air and water quality, traffic flow,

pollution, noise levels, emergency medical services, drainage, and flood control, among others. They have an interest in maintaining the integrity of the environment on and near their property.

39.     **Donovan Maretick** is a member of TAHSR. He owns property in Waller County located at 349 Petty Road, Waller, Texas 77484 and will be directly and adversely impacted by the Project. He makes regular use and enjoyment of the public lands, wetlands, and waters near his property, all of which will be directly impacted by the Project. Mr. Maretick attended scoping meetings and EIS public hearings and submitted comments regarding the relevant EIS documents. He will be irreparably harmed by construction of the Project, which will decrease the value and diminish his use and enjoyment of his property and surrounding areas. Mr. Maretick lives near where the Project will be constructed and operated and would feel the environmental effects of the Project, including effects to air and water quality, traffic flow, pollution, noise levels, emergency medical services, drainage, and flood control, among others. He has an interest in maintaining the integrity of the environment on and near his property.

40.     **Ronald and Becky Scasta** are members of TAHSR. They own property in Ellis County located at 2862 Old Boyce Road, Waxahachie, Texas 75165 and will be directly and adversely impacted by the Project. They make regular use and enjoyment of the public lands, wetlands, and waters near their property, all of which will be directly impacted by the Project. The Scastas attended scoping meetings and EIS public hearings and submitted comments regarding the relevant EIS documents. They will be irreparably harmed by construction of the Project, which will decrease the value and diminish their use and enjoyment of their property and surrounding areas. The Scastas live near where the Project will be constructed and operated and would feel the environmental effects of the Project, including effects to air and water quality, traffic flow,

pollution, noise levels, emergency medical services, drainage, and flood control, among others. They have an interest in maintaining the integrity of the environment on and near their property.

41.     **Logan D. Wilson II** is a member of TAHSR. He owns property in Limestone County located at Limestone County Road 446, Mexia, Texas 76667 and will be directly and adversely impacted by the Project. He makes regular use and enjoyment of the public lands, wetlands, and waters near his property, all of which will be directly impacted by the Project. Mr. Wilson attended scoping meetings and EIS public hearings and submitted comments regarding the relevant EIS documents. He will be irreparably harmed by construction of the Project, which will decrease the value and diminish his use and enjoyment of his property and surrounding areas. Mr. Wilson lives near where the Project will be constructed and operated and would feel the environmental effects of the Project, including effects to air and water quality, traffic flow, pollution, noise levels, emergency medical services, drainage, and flood control, among others. He has an interest in maintaining the integrity of the environment on and near his property.

42.     **David and Heather Miseldine** are members of TAHSR. They own property in Grimes County located at 13752 Durango Ranch Road, Plantersville, Texas 77363 and will be directly and adversely impacted by the Project. They make regular use and enjoyment of the public lands, wetlands, and waters near their property, all of which will be directly impacted by the Project. The Miseldines attended scoping meetings and EIS public hearings and submitted comments regarding the relevant EIS documents. They will be irreparably harmed by construction of the Project, which will decrease the value and diminish their use and enjoyment of their property and surrounding areas. The Miseldines live near where the Project will be constructed and operated and would feel the environmental effects of the Project, including effects to air and water quality, traffic flow, pollution, noise levels, emergency medical services, drainage, and flood control,

among others. They have an interest in maintaining the integrity of the environment on and near their property.

**Impacted counties.**

43.      **Waller County, Texas** is a body corporate and politic under the laws of the State of Texas. Waller County has specific government interests at stake in this litigation and has standing to seek redress of the specific concrete injuries it will suffer. The Project's proposed route runs through Waller County. The Project will impact its residents, businesses, neighborhoods, property owners, and commuters for generations to come.

44.      The Waller County Commissioners Court (members of the County's five-person legislative body) and County staff spent countless hours and resources attending scoping and EIS meetings and reviewing the Draft and Final EIS, both of which are documents FRA prepared and published (as required by law) to describe the Project's environmental impacts. The County submitted comments during the EIS process, which Defendants did not adequately address.

45.      The Project will have several adverse impacts on the residents and property of Waller County. For example, it would displace residential housing units and businesses, resulting in the loss of significant tax base and revenue to the County. As another example, real property owned by Waller County will be used or taken for either additional right-of-way or study areas for the Project both during and after construction.

46.      Waller County has specific government interests at stake in this litigation including its responsibilities over air quality, water quality, flood control, roadways, and emergency management. The Project will serve as a barricade significantly impeding east-west vehicular traffic in Waller County, substantially affecting existing county roads and other infrastructure. In Waller County, the Project will impact a minimum of six to ten county roads and one highway.

The Project construction period will result in the disruption of traffic flows, longer travel times, increased local street traffic, and increased air pollution levels along all segments within Waller County. Storm runoff will increase flows in the bayous and drainage ditches of Waller County and carry increased loads of pollutants, both during and after construction.

47.     Waller County oversees emergency management with the County Judge serving as Director of Emergency Management. The Project's proposed route through Waller County is in proximity to a major hurricane evacuation route for the entire region, and the construction period will span many hurricane seasons which may require Waller County to alter its existing evacuation plans. The Project, both during and after construction, will cause traffic jams, delayed emergency medical services, and risks to public safety.

48.     The Waller Harris Emergency Services District No. 200 (the "District") also provides emergency services throughout the impacted area of the Project's proposed alignment. These services could be negatively impacted by the Project due to its potential impact on county and private roads, many of which are used for emergency vehicles that now service the District and provide an eight-minute response time. The Project will disrupt this service and increase the response time to dangerous and unacceptable levels.

49.     The District is funded with ad valorem taxation and any diminution of value due to the Project will cause a tax increase to cover expenses and budgets. Each fire department costs $4.5 million for the building, equipment and staffing. An ambulance costs $300,000 and requires staff twenty-four hours a day, 365 days a year. The District will need new fire stations and emergency services should the Project divide it.

50.     The District is also very concerned with catastrophic accidents that may result from the Project. Hundreds of ambulances, life flights, and emergency services will be needed and the

District would not be able to handle this type of emergency. To date, there has been no discussion with FRA as to how they will resolve these conflicts.

51.     Waller County is a rural community with a high minority population: 25.6% African American and 29.8% Hispanic, totaling 55.4% of Waller County's population. Because FRA failed to consider and evaluate all reasonable alternatives, as NEPA requires, it failed to consider the Project's disparate impact on these minority groups.

52.     The EPA website page under "Environmental Justice" states: "Federal Actions to Address Environmental Justice in Minority Populations and Low-Income Populations" (EO 12898) directs each Federal Agency to "make achieving environmental justice part of its mission by identifying and addressing, as appropriate, disproportionately high and adverse human health or environmental effects of its programs, policies, and activities on minority populations and low-income populations," including tribal populations. The Presidential Memorandum accompanying EO 12898 emphasizes the importance of using the NEPA review processes to promote environmental justice." FRA failed to carry out its responsibility under NEPA and EO 12898.

53.     In April of 2016, Waller County received an incredible amount of rainfall within a short period of time, which resulted in a massive flooding event. In one location, Waller County recorded 23.5 inches of rain in only fourteen hours, with over 400 properties being flooded. This impacted area drains into the suburbs of Houston and out to the Gulf of Mexico. Because there has been no comparison of potential flooding events across the Project's proposed Build Alternatives, there has been no analysis of how the Project may impact potential flooding events if constructed through Waller County.  Local environmental impacts include the Spring Creek Watershed where five creeks will be impacted by the Project. This watershed will be directly impacted by the Project depending on how it is constructed, especially if it is built on an earthen berm. Tropical Storm

Allison, the Tax Day Floods, the flooding event in May of 2016, and Hurricane Harvey have shown that any impediments to water flow through the watershed cause major flooding and damage to property. These issues were brought to FRA's attention, but it ignored them.

54. Waller County, through the Waller County Sub-Regional Planning Commission (the "Commission"), made multiple requests to coordinate with FRA to provide a complete and accurate understanding of the Project's potential environmental impacts on Waller County. The Commission is a formally-created entity under Texas Local Government Code 391. Its members include Waller County, the City of Waller, Prairie View, Pine Island, Hempstead, Pattison, Brookshire, Katy, Waller ISD, and Hempstead ISD.

55. FRA refused to meet with Waller County to engage in coordination. In February 2015, the Commission held its first coordination meeting with the TxDOT which, at that time, was designated as a co-lead agency on the Project. At that meeting, Waller County made TxDOT aware of a number of impacts the Project would have on Waller County and its communities and requested that the information be forwarded to FRA.

56. In May 2015, Waller County sent a follow-up letter to TXDOT regarding additional coordination meetings. Soon after, TxDOT advised Waller County that it would not engage in further coordination. Waller County later learned that FRA had instructed TxDOT to cease coordination with Waller County. FRA then removed TxDOT as a co-lead agency on the Project.

57. The Project's proposed alignment runs through a portion of Waller County that is currently experiencing a high rate of commercial and residential development. The Project will disrupt business development and negatively impact property values in this area of Waller County. The Project will also cause landowners to lose value in their property. The decreased valuation of

property in Waller County will result in lower tax revenue, which, in turn, means less money for school districts, cities, emergency services, and other public entities in Waller County.

58.     Saddle Creek Forest, Plantation Forest, Oak Hollow, Remington Forest, and Six Pines are residential developments in Waller County. The Project's propose alignment runs right through these developments, resulting in substantial environmental impacts. The Project will also cross four horse riding trails within these developments, thus destroying the viability of these equestrian facilities while creating dangerous situations for riders in the area.

59.     The Project will impact historically significant locations, objects, and cultural resources within Waller County. FRA failed to address these potential impacts as well.

60.     FRA was also made aware of life-threatening public safety issues concerning the Atmos Energy Turbine Powered Natural Gas Compression Station in Waller County, located near the Project's proposed alignment. Yet, FRA failed to address these potential impacts.

61.     **Grimes County, Texas** is a body corporate and politic under the laws of the State of Texas. Grimes County has specific government interests at stake in this litigation and has standing to seek redress of the specific concrete injuries it will suffer. The Project's proposed route runs through Grimes County. In addition, the Project's proposed sole intermediate stop is located in Grimes County. The Project will impact Grimes County residents, businesses, neighborhoods, property owners, and commuters for generations to come.

62.     The Grimes County Commissioners Court (members of the County's five-person legislative body) and County staff spent countless hours and resources attending scoping and EIS meetings and reviewing the Draft and Final EIS, both of which are documents FRA prepared and published (as required by law) to describe the Project's environmental impacts. The County submitted comments during the EIS process, which Defendants did not adequately address.

63.     The Project will have several adverse impacts on the residents and property of Grimes County. For example, it would displace residential housing units and businesses, resulting in the loss of significant tax base and revenue to the County. As another example, real property owned by Grimes County will be used or taken for either additional right-of-way or study areas for the Project both during and after construction.

64.     Grimes County has specific government interests at stake in this litigation including its responsibilities over air quality, water quality, flood control, roadways, and emergency management. The Project will serve as a barricade significantly impeding east-west vehicular traffic in Grimes County and substantially affecting existing county roads and other infrastructure. In Grimes County, the Project will impact a number of county roads. The Project construction period will result in the disruption of traffic flows, longer travel times, increased local street traffic, and increased air pollution levels along all segments within Grimes County. Storm runoff will increase flows in the creeks, streams, and drainage ditches of Grimes County and carry increased loads of pollutants, both during and after construction.

65.     Grimes County oversees emergency management with the County Judge serving as Director of Emergency Management. The Project's proposed route through Grimes County is in proximity to a major hurricane evacuation route for the entire region, and the construction period will span many hurricane seasons which may require Grimes County to alter its existing evacuation plans. The Project, both during and after construction, will cause traffic jams, delayed emergency medical services, and risks to public safety.

66.     In April of 2016, Grimes County received an incredible amount of rainfall within a short period of time, which resulted in a massive flooding event. Because there has been no comparison of potential flooding events across the Project's proposed Build Alternatives, there

has been no analysis of how the Project may impact flooding events if constructed through Grimes County. Tropical Storm Allison, the Tax Day Floods, the flooding event in May of 2016, and Hurricane Harvey have shown that any impediments to water flow cause major flooding and damage to property. These issues were brought to FRA's attention, but it ignored them.

67. **Madison County, Texas** is a body corporate and politic under the laws of the State of Texas. Madison County has specific government interests at stake in this litigation and has standing to seek redress of the specific concrete injuries it will suffer. The Project's proposed route runs through Madison County. The Project will impact its residents, businesses, neighborhoods, property owners, and commuters for generations to come.

68. The Madison County Commissioners Court (members of the County's five-person legislative body) and County staff spent countless hours and resources attending scoping and EIS meetings and reviewing the Draft and Final EIS, both of which are documents FRA prepared and published (as required by law) to describe the Project's environmental impacts. The County submitted comments during the EIS process, which Defendants did not adequately address.

69. The Project will have several adverse impacts on the residents and property of Madison County. For example, it would displace residential housing units and businesses, resulting in the loss of significant tax base and revenue to the County. As another example, real property owned by Madison County will be used or taken for either additional right-of-way or study areas for the Project both during and after construction.

70. Madison County has specific government interests at stake in this litigation including its responsibilities over air quality, water quality, flood control, roadways, and emergency management. The Project will serve as a barricade significantly impeding east-west vehicular traffic in Madison County, substantially affecting existing county roads and other

infrastructure. In Madison County, the Project will impact a number of county roads. The Project construction period will result in the disruption of traffic flows, longer travel times, increased local street traffic, and increased air pollution levels along all segments within Madison County. Storm runoff will increase flows in the creeks, streams, and drainage ditches of Madison County and carry increased loads of pollutants, both during and after construction.

71.     Madison County oversees emergency management with the County Judge serving as Director of Emergency Management. The Project's proposed route through Madison County is in proximity to a major hurricane evacuation route for the entire region, and the construction period will span many hurricane seasons which may require Madison County to alter its existing evacuation plans. The Project, both during and after construction, will cause traffic jams, delayed emergency medical services, and risks to public safety.

72.     In April of 2016, Madison County received an incredible amount of rainfall within a short time period, which resulted in a massive flooding event. Because there has been no comparison of potential flooding events across the Project's proposed Build Alternatives, there has been no analysis of how the Project may impact potential flooding events if constructed through Madison County. Tropical Storm Allison, the Tax Day Floods, and the flooding event in May of 2016 have shown that impediments to water flow in Madison County cause major flooding and damage to property. These issues were brought to FRA's attention, but it ignored them.

73.     **Leon County, Texas** is a body corporate and politic under the laws of the State of Texas. Leon County has specific government interests at stake in this litigation and has standing to seek redress of the specific concrete injuries it will suffer. The Project's proposed route runs through Leon County. The Project will impact its residents, businesses, neighborhoods, property owners, and commuters for generations to come.

74.     The Leon County Commissioners Court (members of the County's five-person legislative body) and County staff spent countless hours and resources attending scoping and EIS meetings and reviewing the Draft and Final EIS, both of which are documents FRA prepared and published (as required by law) to describe the Project's environmental impacts. The County submitted comments during the EIS process, which Defendants did not adequately address.

75.     The Project will have several adverse impacts on the residents and property of Leon County. For example, it would displace residential housing units and businesses, resulting in the loss of significant tax base and revenue to the County. As another example, real property owned by Leon County will be used or taken for either additional right-of-way or study areas for the Project both during and after construction.

76.     Leon County has specific government interests at stake in this litigation including its responsibilities over air quality, water quality, flood control, roadways, and emergency management. The Project will serve as a barricade significantly impeding east-west vehicular traffic in Leon County, substantially affecting existing county roads and other infrastructure. In Leon County, the Project will impact a number of county roads. The Project construction period will result in the disruption of traffic flows, longer travel times, increased local street traffic, and increased air pollution levels along all segments within Leon County. Storm runoff will increase flows in the creeks, streams, and drainage ditches of Leon County and carry increased loads of pollutants, both during and after construction.

77.     Leon County oversees emergency management with the County Judge serving as Director of Emergency Management. The Project's proposed route through Leon County is in proximity to a major hurricane evacuation route for the entire region, and the construction period will span many hurricane seasons which may require Leon County to alter its existing evacuation

plans. The Project, both during and after construction, will cause traffic jams, delayed emergency medical services, and risks to public safety.

78.     In April of 2016, Leon County received an incredible amount of rainfall within a short time period, which resulted in a massive flooding event. Because there has been no comparison of potential flooding events across the Project's proposed Build Alternatives, there has been no analysis of how the Project may impact potential flooding events if constructed through Leon County. Tropical Storm Allison, the Tax Day Floods, and the flooding event in May of 2016 have shown that any impediments to water flow in Leon County cause major flooding and damage to property. These issues were brought to FRA's attention, but it ignored them.

79.     **Navarro County, Texas** is a body corporate and politic under the laws of the State of Texas. Navarro County has specific government interests at stake in this litigation and has standing to seek redress of the specific concrete injuries it will suffer. The Project's proposed route runs through Navarro County. The Project will impact its residents, businesses, neighborhoods, property owners, and commuters for generations to come.

80.     The Navarro County Commissioners Court (members of the County's five-person legislative body) and County staff spent countless hours and resources attending scoping and EIS meetings and reviewing the Draft and Final EIS, both of which are documents FRA prepared and published (as required by law) to describe the Project's environmental impacts. The County submitted comments during the EIS process, which Defendants did not adequately address.

81.     The Project will have several adverse impacts on the residents and property of Navarro County. For example, it would displace residential housing units and businesses, resulting in the loss of significant tax base and revenue to the County. As another example, real property

owned by Navarro County will be used or taken for either additional right-of-way or study areas for the Project both during and after construction.

82. Navarro County has specific government interests at stake in this litigation including its responsibilities over air quality, water quality, flood control, roadways, and emergency management. The Project will serve as a barricade significantly impeding east-west vehicular traffic in Navarro County, substantially affecting existing county roads and other infrastructure. In Navarro County, the Project will impact a number of county roads. The Project construction period will result in the disruption of traffic flows, longer travel times, increased local street traffic, and increased air pollution levels along all segments within Navarro County. Storm runoff will increase flows in the creeks, streams, and drainage ditches of Navarro County and carry increased loads of pollutants, both during and after construction.

83. Navarro County oversees emergency management with the County Judge serving as Director of Emergency Management, and the Project's proposed route through Navarro County is in proximity to a major hurricane evacuation route for the entire region. The Project construction period will span many hurricane seasons which may require Navarro County to alter its existing evacuation plans. The Project, both during and after construction, will cause traffic jams, delayed emergency medical services, and risks to public safety.

84. **Freestone County, Texas** is a body corporate and politic under the laws of the State of Texas. Freestone County has specific government interests at stake in this litigation and has standing to seek redress of the specific concrete injuries it will suffer. The Project's proposed route runs through Freestone County. The Project will impact its residents, businesses, neighborhoods, property owners, and commuters for generations to come.

85. The Freestone County Commissioners Court (members of the County's five-person legislative body) and County staff spent countless hours and resources attending scoping and EIS meetings and reviewing the Draft and Final EIS, both of which are documents FRA prepared and published (as required by law) to describe the Project's environmental impacts. The County submitted comments during the EIS process, which Defendants did not adequately address.

86. The Project will have several adverse impacts on the residents and property of Freestone County. For example, it would displace residential housing units and businesses, resulting in the loss of significant tax base and revenue to the County. As another example, real property owned by Freestone County will be used or taken for either additional right-of-way or study areas for the Project both during and after construction.

87. Freestone County has specific government interests at stake in this litigation including its responsibilities over air quality, water quality, flood control, roadways, and emergency management. The Project will serve as a barricade significantly impeding east-west vehicular traffic in Freestone County, substantially affecting existing county roads and other infrastructure. In Freestone County, the Project will impact a number of county roads. The Project construction period will result in the disruption of traffic flows, longer travel times, increased local street traffic, and increased air pollution levels along all segments within Freestone County. Storm runoff will increase flows in the creeks, streams, and drainage ditches of Freestone County and carry increased loads of pollutants, both during and after construction.

88. Freestone County oversees emergency management with the County Judge serving as Director of Emergency Management. The Project's proposed route through Freestone County is in proximity to a major hurricane evacuation route for the entire region, and the construction period will span many hurricane seasons and may require Freestone County to alter its existing

evacuation plans. The Project, both during and after construction, will cause traffic jams, delayed emergency medical services, and risks to public safety.

**Plaintiffs have standing.**

89. Plaintiffs have recreational, aesthetic, property, and other concrete interests that will be adversely impacted and irreparably harmed by the Project due to Defendants' arbitrary and capricious decision-making. Plaintiffs will be further harmed to the extent the RPA, ROD, or Final EIS may be used to support the Project (or another HSR project affecting Plaintiffs).

90. FRA admits the RPA is a predicate for the Project. Plaintiffs are adversely affected and aggrieved by Defendants' unlawful approval of the Final EIS and issuance of the RPA (both of which rely on the ROD). Defendants' failure to comply with federal law will result in irreparable harm to Plaintiffs, the environment, and public safety. Because the challenged agency action—Defendants' approval of the Final EIS, issuance of the ROD, and promulgation of the RPA—is the cause of Plaintiffs' injuries, an order vacating Defendants' actions and requiring compliance with federal law would redress Plaintiff's injuries, at least in part.

91. Moreover, the Final EIS and ROD are predicates for the issuance of a construction permit from the Surface Transportation Board, without which the Project cannot be built. Accordingly, declaration of the insufficiency of the Final EIS, vacatur of the ROD, and vacatur of the RPA would prevent the issuance of a construction permit until such time as Texas Central files an application to construct and all NEPA requirements are satisfied, providing redress to Plaintiffs.

92. Plaintiffs have each suffered an injury in fact that is concrete and particularized, actual or imminent, and fairly traceable to Defendants' conduct. In addition, Plaintiffs have raised issues related to the impacts of the Project on the environment. Therefore, their interests fall within the zone of interests protected by NEPA.

**DEFENDANTS**

93.    The U.S. Department of Transportation ("DOT") is responsible for transportation in the United States. Its statutory responsibilities are carried out by different offices, including the Office of the Secretary, and several "operating administrations," including FRA.

94.    Pete Buttigieg is the Secretary of Transportation and is sued in his official capacity.

95.    The Federal Railroad Administration ("FRA") was created by the Department of Transportation Act of 1966. It is one of ten agencies within DOT concerned with intermodal transportation. FRA's mission is "to enable the safe, reliable, and efficient movement of people and goods for a strong America, now and in the future."

96.    FRA oversaw preparation of the Final EIS, in cooperation with the U.S. Army Corps of Engineers, the Environmental Protection Agency, the Federal Highway Administration, the Surface Transportation Board, and the U.S. Fish and Wildlife Service.

97.    FRA also issued the ROD, cited as a basis for FRA's promulgation of the RPA.

98.    Ronald Batory is the former Administrator of FRA and is sued in his official capacity. The current Administrator of FRA is unknown and may be substituted in due course.

99.    Paul Nissenbaum is the Associate Administrator, Railroad Policy and Development, of FRA and is sued in his official capacity. Mr. Nissenbaum signed the Final EIS.

100.    Quintin Kendall is the former Deputy Administrator of FRA and is sued in his official capacity. Mr. Kendall signed the RPA and ROD. The current Deputy Administrator of FRA is unknown and may be substituted in due course.

**FACTUAL BACKGROUND**

**A.    Texas Central's proposed high-speed rail project.**

101.    In 2012, a group of wealthy Texas businessmen formed a group of affiliated entities collectively known as "Texas Central." Backed by the Japan Bank of International Cooperation, a

public financial institution and export credit agency owned by the Japanese government, Texas Central began promoting a high-speed rail project between Dallas and Houston to be used exclusively for passenger service.

102.    The Project encompasses a 240-mile-long, 40-foot-high, fully sealed corridor on dedicated track with no grade crossings, running at speeds of up to 200 mph, using trains, track, and core systems replicating the Shinkansen technology operated by Central Japan Railway Company. Some segments of the Project will run on a 20-foot-high land berm — a level, raised earthen barrier. Other segments will run on an elevated concrete viaduct. The Project's right-of-way would average 328 feet in width to accommodate a two-track HSR system and an access road.

103.    The proposed Shinkansen system must travel on dedicated HSR tracks for passenger rail service. Its trains cannot travel on any existing or planned rail infrastructure, nor can it share tracks or connect with any other passenger rail. By design, the Project is thus not "interoperable" with any other existing or planned transportation infrastructure.

**B.    FRA initially "scopes" an EIS to evaluate the impacts that may result from construction and operation of the Project.**

104.    On June 25, 2014, FRA published a Notice of Intent to prepare an EIS to evaluate "the impacts of constructing and operating" Texas Central's proposed HSR. At the time, FRA referred to the Project as the "Proposed Action" requiring review "pursuant to NEPA."

105.    FRA stated it would, in its EIS, evaluate "route alternatives for passenger rail for the corridor between Dallas and Houston" along with "alternatives for construction and operation of *the Proposed Action* consisting of a sealed HSR corridor." (emphasis added).

106.    Although FRA mentioned Texas Central's proposal to use the Shinkansen technology, the Notice of Intent did not mention anything relating to any proposed rulemaking, the RPA, or the development of safety standards for Texas Central's proposed HSR.

107.    In late 2014, FRA hosted public scoping meetings along the Dallas to Houston corridor. The public comment period for the scoping process closed on January 9, 2015.

108.    During the scoping process, FRA assessed nine proposed alternative alignments (routes) for the Project: the Utility Corridor, Utility Corridor with I-45 Option, BNSF Options 1, 2, 3 and 4, UPRR Option, I-45 Option, and I-45 Hardy Option. These alignments are shown below:



109. At the scoping meetings, FRA presented a PowerPoint presentation titled *Dallas to Houston High-Speed Rail Environmental Impact Statement* ("Scoping PowerPoint"), which outlined the purpose of scoping and the NEPA process.

110. In the Scoping PowerPoint, FRA represented that the "Purpose" of the "privately funded" Project was to "construct and operate reliable, safe and economically viable passenger high-speed rail service between Dallas and Houston."

111. The Scoping PowerPoint included a "Stop Light" chart used to assess the strengths and weaknesses of the nine alternative alignments between Dallas and Houston:

| Alternative Evaluation Stoplight Chart | | Alternative | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | BNSF w/ Option 1 | BNSF w/ Option 2 | BNSF w/ Option 3 | BNSF w/ Option 4 | I-45 w/ Hardy Option | I-45 | UPRR | Utility Corridor w/ I-45 | Utility Corridor |
| Weighting | Group | Results Summary | | | | | | | | |
| 1 | Financial Considerations | 2.9 | 2.1 | 2.3 | 2.6 | 1.3 | 1.3 | 2.1 | 2.1 | 2.9 |
| 1 | Engineering Considerations | 2.0 | 1.7 | 1.7 | 1.7 | 1.7 | 1.7 | 1.6 | 2.1 | 2.6 |
| 2 | Environmental Considerations | 3.6 | 3.6 | 3.6 | 3.6 | 3.6 | 3.6 | 4.0 | 3.6 | 4.2 |
| FINAL Alternative Score | | 8.4 | 7.4 | 7.6 | 7.8 | 6.6 | 6.6 | 7.7 | 7.8 | 9.7 |

LEGEND

>8.0 Recommended for further evaluation

7.0 - 7.9 Not recommended for further evaluation, but these alternatives may be re-evaluated upon introduction of new data.

<7.0 Not recommended for further evaluation

112. FRA recommended the Utility Corridor and BNSF Option 1 for further evaluation, asserting that "[Texas Central's] focus is on financial and project delivery considerations." FRA told stakeholders the other alternatives were "considered, but eliminated from further evaluation."

**Texas Central's Screening Report.**

113. On March 22, 2015, Texas Central released its *Step 1 Screening of Corridor Alternatives Report* ("Screening Report"), in which it stated: "The purpose of the privately proposed Project is to provide reliable, safe, and economically viable passenger rail transportation

using proven high-speed rail technology." To achieve this purpose, Texas Central (like FRA previously) stressed that the Project must be economically viable:

> Economic: achieve a favorable return on investment when weighing expected ridership and revenue against estimated project capital investments, project delivery schedule, and long-term operations and maintenance expense.

114.     Texas Central assured stakeholders that its analysis of alignment alternatives included economic viability, noting that the proposed alignments were compared across multiple separate categories of criteria, including "economic."

115.     In the Screening Report, Texas Central admitted it had resorted to the "Stop Light" chart from the Scoping PowerPoint "since it is not practical to perform an overall quantitative ranking of alignments for major transportation infrastructure alternatives such as this." Rather than perform an overall quantitative ranking, Texas Central grouped the categories and applied a "simplified weighting approach … to each group to reflect the fact that some considerations would heavily influence the overall economic viability of the Project."

116.     The groups of evaluation criteria used for comparison consisted of Financial and Project Delivery Considerations (Group A), Engineering Considerations (Group B), and Environmental Considerations (Group C). In each Group, Texas Central tallied the number of red, yellow, and green values to arrive at an overall total for each alignment, with stoplight colors denoting the following values: Red = 1, Yellow = 2, Green = 3. This total value was then "normalized" by dividing the total tally by the number of evaluation categories in each Group.

117.     Texas Central then multiplied the group totals as follows: Group A = 2 points, Group B = 1 point, Group C = 1 point. According to Texas Central, the double-weighting of Group A (Financial Considerations) "reflects the critical importance of financial viability for the Project." Group totals were then tallied to arrive at an overall score for each alignment.

118.    From this review, Texas Central concluded that its preferred alternative was the Utility Corridor and the other eight alternatives required no further evaluation. Before addressing why Texas Central claims to have chosen the Utility Corridor, its reasons for eliminating the other alternatives merit discussion.

119.    Texas Central eliminated the I-45 and I-45 Hardy Line Options "due to constructability issues, cost, and potential risk." Use of the I-45 corridor, according to Texas Central, would result in "significant property impacts."

120.    While the UPRR Option scored well in "environmental considerations," it scored lowest in terms of engineering considerations. For this reason, Texas Central eliminated it.

121.    BNSF Option 1 scored higher than the other BNSF Options and "initially appeared promising." However, Texas Central claimed BNSF Option 1 would not meet its "purpose to provide reliable, safe and economically viable high-speed passenger transportation" because "capital construction costs, right-of-way acquisitions, construction duration, and expected schedule to resolve risk mitigation issues make usage of [BNSF Option 1] economically unviable."

122.    Texas Central eliminated BNSF Option 2 because it ranked lowest of the BNSF Options due to "constructability issues, cost, and potential risk." It discarded BNSF Option 3 "due to the increased number of major structures, particularly the crossing of the Richland Chambers Reservoir." And although Texas Central concluded BNSF Option 4 might impact less environmentally sensitive habitats, it "would require more major structures and potentially experience regulatory and stakeholder coordination requirements."

123.    Finally, while the Utility Corridor with I-45 Option scored well "relative to other alignments," it was eliminated because it did not score as well as the Utility Corridor.

124. According to the Screening Report, Texas Central chose the Utility Corridor because it would "present the fewest construction challenges and the least risk to financial viability given decreased costs and risks," while "allow[ing] for an accelerated construction schedule, which is critical for a privately funded project that will need to provide a reasonable return on investment for Project shareholders."

125. For these purported reasons, Texas Central recommended that the Utility Corridor serve "as a base alignment" for further detailed study of alignment alternatives.

**Texas Central's Last Mile Report.**

126. On March 27, 2015, Texas Central released its *Texas Central High-Speed Railway Last Mile Analysis Report* ("Last Mile Report"), the purpose of which was to document a "detailed comparative evaluation of the marginal costs and impacts associated with reaching progressively farther into the urban core" to access proposed station locations in Dallas and Houston. Texas Central repeated its promise "to build a reliable, safe, and profitable passenger [HSR] transportation system between Houston and Dallas."

127. In the Last Mile Report, Texas Central claimed the Utility Corridor and BNSF Option 1 were both initially found to be potentially feasible corridors "with respect to expected impacts and financial viability." However, Texas Central explained that it had determined potential alignments within BNSF Option 1 were "not feasible" and would not meet "[Texas Central's] purpose to provide reliable, safe, and economically viable high-speed passenger transportation."

128. Later in the report, Texas Central repeated this claim nearly verbatim, making clear that BNSF Option 1 was eliminated because it "would not meet [Texas Central's] purpose to provide reliable, safe and economically viable high-speed passenger transportation." And, Texas Central discussed at length the criteria used for comparatively assessing the alignment alternatives,

explaining that Group A contained "those categories of criteria that represent the greatest impact on the economic viability of the overall Project."

129.     Texas Central concluded that among the Houston Utility Corridor last mile alternatives, Alternative B rated the highest. Among the Dallas alternatives. Texas Central rated Alternative C the highest as it would, among other factors, "provide the most ridership."

**FRA's Scoping Report.**

130.     In April 2015, FRA released its *Environmental Impact Statement Scoping Report* ("Scoping Report") to "summarize the public and agency scoping process and the comments received during the public scoping period for the Project."

131.     In the "Comments on Proposed Purpose and Need" section, FRA explained what is meant by "Purpose and Need." According to FRA, the "Purpose and Need provides the foundation for the reasonable range of alternatives that will be evaluated in the Draft EIS." FRA then told stakeholders it had presented a draft Purpose and Need statement during the scoping meetings, which included an "economically viable Project."

132.     With respect to economic viability, FRA noted that Texas Central estimated ridership of "12,000 passengers per day," which totals 4.38 million passengers per year. However, FRA conceded it "does not maintain financial information on [Texas Central]" and "is not responsible for verifying [Texas Central's] ridership forecasts." Years later, Texas Central would further increase these already absurd ridership forecasts.

**FRA's Technical Report.**

133.     On August 10, 2015, FRA issued its *Corridor Alternatives Analysis Technical Report* ("Technical Report"), which contained a "corridor-level evaluation" of the Project

"reflect[ing] FRA's independent analysis and judgment in its capacity as the federal lead agency for the EIS."

134.     In a section titled "Purpose and Need for the Project," FRA stated: "As defined by [Texas Central], the purpose of the privately proposed Project is to provide reliable, safe and economically viable passenger rail transportation using proven high-speed rail technology between Dallas and Houston." FRA then listed three requirements Texas Central must meet (Technological, Operation, and Environmental) to achieve its "economic viability and safety requirements."

135.     FRA stated it would be conducting "a second screening analysis" to provide "a more detailed evaluation of the range of potential location alignments near and within the Utility Corridor." This screening analysis would be used to evaluate "the location alignments within this corridor to identify the Build Alternatives that will be subject to evaluation in the EIS."

136.     After listing alleged "constraints" related to travel between Dallas and Houston, FRA concluded, "[a]s a result of these constraints, combined with the distance between the two metropolitan areas and potential ridership demand, Texas Central identified an opportunity to develop a profitable privately-financed and operated high-speed passenger rail system."

**FRA's Alignment Report.**

137.     On November 6, 2015, FRA released its *Alignment Alternatives Analysis Report* ("Alignment Report"), in which it identified six alignment alternatives along the Utility Corridor to be evaluated in the draft environmental impact statement ("Draft EIS"), as shown below:



138.    Because parts of some of the segments overlapped, it was not possible for FRA to show all six alternatives on a single map. As a result, FRA pieced the segments together to create six end-to-end alignment alternatives, as shown in the following table:

| Table 6-2: Draft EIS End-to-End Alignment Alternatives | |
| --- | --- |
| Draft Alignment Alternative | Segments |
| Alternative A | 1, 2a, 3a, 4, 5 |
| Alternative B | 1, 2a, 3b, 4, 5 |
| Alternative C (IH-45A) | 1, 2a, 3c, 5 |
| Alternative D | 1, 2b, 3a, 4, 5 |
| Alternative E | 1, 2b, 3b, 4, 5 |
| Alternative F (IH-45B) | 1, 2b, 3c, 5 |

139. Segment 1 (through Dallas County), segment 4 (through Freestone, Limestone, Leon, and Madison County), and segment 5 (through Grimes, Waller, and Harris County) did not include alternative alignments (for example, 2a or 2b, 3a or 3b). Rather, FRA had pre-determined the location of the alignment within these segments (1, 4, and 5) prior to evaluation in the Draft EIS. Put another way, because segments 1, 4, and 5 did *not* include "a" or "b" alternatives, they were "frozen" in place before preparation of the Draft EIS even began.

140. To make matters worse, FRA had not even disclosed the location of certain portions of the pre-determined alignments within segments 1, 4, and 5 during the scoping process. For example, the location of HC-4 (maroon line in segment 5) was *never* identified or disclosed during the scoping process. In fact, FRA had not even mentioned "HC-4" in any of its prior terminology.

141. As a result, landowners who left the scoping meetings in late 2014 believing their property would not be impacted by any of the potential alignments later discovered they would be directly impacted by the previously undisclosed HC-4 alignment. And it was too late for them to comment because the January 9, 2015 deadline had passed. Similar instances occurred with respect to the other "frozen" segments of the alignment along the Utility Corridor.

142. The Alignment Report also contained a "Purpose and Need" section, in which FRA stated: "As defined by [Texas Central], the purpose of the privately proposed Project is to provide

37

reliable, safe and economically viable passenger rail transportation using proven high-speed rail technology between Dallas and Houston." FRA then discussed the requirements that must be met to achieve "economic viability," claiming that Texas Central had "identified an opportunity to develop a profitable privately-financed and operated high-speed passenger rail system."

143.    In a discussion of last mile Houston alignment alternatives, FRA stated that "[g]iven the cost to build the Downtown Houston potential route alternatives, they do not meet the economic viability of the Project purpose and need." For this reason, FRA eliminated the DH-1 and DH-2 proposed station locations from further consideration.

**Texas Central's stakeholder letter.**

144.    On or soon after November 6, 2015 (the date FRA released its Alignment Report), Texas Central sent a letter to stakeholders concerning "an important milestone." Texas Central claimed: "Last week, the [FRA] published a technical report that concluded the Utility Corridor is preferred from an environmental perspective over the BNSF corridor because this Corridor is feasible with lesser environmental impacts."

145.    In fact, Texas Central (not FRA) selected the Utility Corridor by March 27, 2015 at the latest (*see* Texas Central's Last Mile Report). And it did so (according to its Last Mile Report) allegedly because the Utility Corridor would present "the least risk to financial viability" while "allow[ing] for an accelerated construction schedule, which is critical for a privately funded project that will need to provide a reasonable return on investment for Project shareholders."

146.    In its stakeholder letter, Texas Central made clear that "FRA must carry forward potential corridor alternatives that meet the Project's purpose and need, which includes the requirement that the project be 'economically viable.'" It also claimed the Project must operate at high speeds "to meet the demands of the market in order for the high-speed rail project to be viable

as a private venture." And while it spoke of economic viability *ad nauseam*, Texas Central made no mention of any environmental concerns.

147.    Later in its letter, Texas Central falsely stated that "[t]he RPA process *is a routine process* used by federal agencies to address new or unique situations that current rules and regulations do not adequately address." (emphasis added). In fact, FRA had *never once* since its creation in 1966 issued an RPA.

## C.    Long after the EIS process began, Texas Central asks FRA to issue an RPA to establish safety standards for the proposed Shinkansen HSR system.

148.    On April 16, 2016, nearly two years after FRA issued its Notice of Intent to prepare an EIS to evaluate the "impacts of constructing and operating" the Project, Texas Central submitted a petition for an RPA, in which it proposed safety rules for the proposed Shinkansen technology.

149.    According to FRA, Texas Central claimed that its proposed RPA translated the Shinkansen system's technological and operational aspects in a manner that can be regulated under framework similar to other U.S. passenger rail operations while maintaining the safety of the system. Simply put, Texas Central asked FRA to create an "alternative regulatory approach" to allow operation of the Shinkansen technology in the U.S.

## D.    FRA prepares an EIS even though it lacked the information necessary to evaluate the Project's myriad adverse environmental impacts.

150.    In early 2016, soon after FRA identified the six alignments within the Utility Corridor to be evaluated in the Draft EIS, Texas Central filed a flurry of state court lawsuits seeking injunctions against landowners who owned property along the Utility Corridor. In each lawsuit, Texas Central sought to enjoin the landowners from interfering with its alleged authority to access the property "for the purposes of conducting examinations and surveys."

151.    In each of the 40+ lawsuits, Texas Central swore that without these surveys it "would be unable to provide information needed by [FRA] and Army Corps to conduct the evaluations needed to select the most advantageous route and minimize impacts on cultural resources, environmental conditions, wetlands, or other features." Texas Central swore further that without these surveys it would be impossible to determine the feasibility of construction "given the natural and cultural resources that may exist" on each property. Finally, Texas Central swore FRA had requested "the physical inspection" of each property "in order to obtain the information to satisfy the environmental review and permitting process."

152.    In sum, Texas Central repeatedly swore it must conduct on-the-ground surveys to provide FRA what it purportedly needed to conduct a proper NEPA review. According to Texas Central, "[w]ithout examination and survey of the Property, there will be no Project."

**E.      FRA never acquires the information necessary to evaluate the Project's impacts.**

153.    Texas Central did not survey the properties owned by the landowners it sued. After suffering several adverse rulings, it dropped its remaining lawsuits in early 2017 and never stepped foot on a substantial portion of property along the Utility Corridor.

154.    In all, Texas Central failed to conduct on-the-ground surveys of at least 35% of the lineal mileage along the Utility Corridor. The table below contains a conservative estimate of the percentage of lineal mileage and acres of affected property that were never surveyed:

| County | Lineal mileage not surveyed | Acreage not surveyed |
|--------|------------------------------|----------------------|
| Waller County | 63% | 3,800 |
| Grimes County | 57% | 15,000 |
| Leon County | 46% | 6,600 |
| Ellis County | 26% | 7,274 |

| | | |
|---|---|---|
| Harris County | 23% | 6,619 |
| Madison County | 21% | 2,100 |
| Limestone County | 11% | 1,900 |
| Freestone County | 10% | 1,900 |
| Navarro County | 9% | 1,783 |

155. Texas Central also failed to conduct surveys on affected adjacent property, to the tune of at least 47,000 acres (73.5 square miles). Because a majority of the impacted property along the Utility Corridor was never surveyed, FRA did not have the information it needed to evaluate the Project's environmental impacts.

**F.     FRA publishes the Draft EIS.**

156. FRA signed the Draft EIS on December 15, 2017, and it was published in the Federal Register on December 22, 2017.

**Texas Central convinces FRA to remove economic viability from the Project's purpose.**

157. In the Draft EIS, FRA stated: "The purpose of the privately proposed Project is to provide the public with reliable and safe high-speed passenger rail transportation between Dallas and Houston." In a mere footnote, FRA conceded, "[a]n initial version of the Project Purpose included economic viability. As the Project developed and through coordination with cooperating agencies, FRA determined that economic viability is an objective of [Texas Central], not a component of the Project Purpose."

158. Exactly *when* FRA may have made this "determination" is unknown, and it never explained how economic viability could be "an objective" of Texas Central's, but not a "component of the Project Purpose."

159.     In any event, FRA's removal of economic viability from the Project's purpose was not based on its own analysis or any "development" or "coordination" with "cooperating agencies." Rather, FRA merely accepted Texas Central's representation that the Project would be "economically viable" and "profitable." From that (unknown) point in time forward, FRA did not consider whether *any* alternative could meet *any* revenue criteria. Instead, FRA simply removed that criteria from the Project's purpose altogether.

**Instead of reconsidering the reasonable alternatives it had eliminated during scoping, FRA plows ahead.**

160.     FRA previously had eliminated eight of the nine preliminary alternative alignments, all of which were reasonable, on the basis that they could not meet the Project's initial purpose of providing reliable, safe, and *economically viable* HSR transportation. But after materially revising the Project's purpose to remove the (previously double-weighted) economic viability factor that resulted in elimination of these alternative alignments, FRA inexplicably decided not to reinsert them back into the EIS process for further evaluation in the Draft EIS.

161.     Instead, FRA analyzed six "Build Alternatives" within the Utility Corridor, each of which included a terminal station in Dallas, an intermediate station in Grimes County near College Station, and three Houston terminal station options. Ultimately, FRA identified Build Alternative A, which encompassed segments 1, 2a, 3a, 4, and 5, as its preferred alternative.

162.     In the Draft EIS, FRA also discussed the no action alternative ("No Build Alternative"), which it was required to evaluate under NEPA. FRA stated: "Under the No Build Alternative, FRA would not issue [an RPA] for the implementation of [the Shinkansen] technology within the U.S.; therefore, [Texas Central] would not be able to operate the HSR system." According to FRA, the No Build Alternative therefore would "not meet the specified Purpose and Need for this Project, but is retained in the EIS as a basis for comparison."

163.     FRA's purported reason for eliminating the No Build Alternative made no sense. Of course, FRA did not *have* to issue an RPA to meet the Project's purpose as stated in the Draft EIS, which was merely to provide reliable and safe HSR transportation between Dallas and Houston. There were then (and are today) a host of alternative HSR systems capable of achieving this purpose that did not require issuance of an RPA, but FRA never considered them.

**FRA claims the RPA is the major federal action requiring review under NEPA.**

164.     In the Draft EIS, FRA stated that it "may issue a Rule of Particular Applicability …, impose requirements or conditions by order(s) or waiver(s), or take other regulatory action(s) to ensure the Project is operated safely." According to FRA, the potential issuance of an RPA "constitutes a major federal action and triggers the environmental review under NEPA." This statement was confounding, to say the least, for two reasons.

165.     First, FRA's statement was directly contradicted by its Notice of Intent to prepare an EIS published in 2014. In that Notice, FRA referred to "constructing and operating" the Project as the "Proposed Action" requiring review "pursuant to NEPA." Likewise, FRA claimed its EIS would evaluate "alternatives for construction and operation of *the Proposed Action* consisting of a sealed HSR corridor." (emphasis added). At the time, FRA did not even mention the RPA or any other potential "regulatory action(s)."

166.     Second, the Draft EIS did not even purport to evaluate the impacts that may result from the RPA: "This [Draft EIS] documents FRA's evaluation of [Texas Central's] proposal to construct and operate a 240-mile, for-profit, [HSR] system connecting Dallas and Houston using the … Shinkansen technology." It would have been impossible for FRA to evaluate the impacts that may result from the RPA in the Draft EIS, as it did not publish its notice proposing the RPA until March 10, 2020—years *after* the NEPA process and preparation of the Draft EIS began.

**FRA blindly adopts Texas Central's economic assumptions.**

167.    In the Draft EIS, FRA claimed Texas Central would not seek "public funding" for the Project.[2] FRA claimed the Project would cost "between $15 billion and $18 billion" to construct. FRA also repeated Texas Central's unsupported, grossly exaggerated ridership projection of 4.4 million annual passengers. FRA regurgitated these economic assumptions—both of which originated from Texas Central—without conducting any investigation or analysis to verify their truthfulness or accuracy.

**G.     FRA issues "Tier III" regulations for high-speed passenger trains.**

168.    On November 21, 2018, FRA issued new safety standards for railroad passenger equipment in an effort to stimulate HSR development in the U.S. The rule established a "Tier III" category for passenger trains traveling between 160 to 220 mph in areas with exclusive rights-of-way and no grade crossings. The rule also established minimum safety standards for Tier III operations with a focus on core, structural, and critical system design criteria.

169.    To meet these standards, the Tier III rule permits HSR systems to utilize existing rail infrastructure. Allowing trains to operate over existing infrastructure creates more flexibility to expand HSR across the country by eliminating the time and expense (and environmental degradation) that inevitably accompanies construction of new rail lines.

170.    Unlike Tier III-compliant trains, outlier standalone systems — like the proposed Shinkansen system — cannot use any existing lines. They do not expand existing intercity rail capacity within a comprehensive national rail network; rather, these standalone systems are, by design, unable to operate on the "last mile" of track penetrating urban areas at slow speeds. They

---

[2] FRA knew this claim was false. In 2014, FRA entered into a Memorandum of Understanding with Texas Central that specifically states Texas Central "may submit applications to [FRA] for loans."

are *not* interoperable, meaning they cannot utilize existing tracks that exclusively reach these city centers, and they are unable to connect to urban rail transportation such as commuter trains, metro lines, or light rail systems through existing networks.

171.    FRA not only understood this in 2018, it found it prudent to detail the disadvantages and weaknesses of these outlier standalone systems relative to Tier III trains:

> Additionally, it would be very costly for a standalone system to attempt to connect with major metropolitan areas because those standalone systems could not take advantage of a major regulatory savings—operating over existing infrastructure. FRA determined that two-thirds to four-fifths of the regulatory cost savings are due to infrastructure cost avoidance for operations electing to use Tier I alternative or Tier III equipment. In particular, interoperability will allow HSR operators to reach into major metropolitan areas where building new, exclusive rights-of-way may not be feasible due to land density, environmental, and other considerations.

172.    Because it did not "anticipate any environmental impacts from the requirements" of the Tier III rule, FRA determined the rule was "categorically excluded from detailed environmental review pursuant to section 4(c)(20) of FRA's procedures."[3] In other words, FRA determined that use of conventional HSR systems (those that *are* interoperable) would *not* have any significant adverse environmental impacts. Thus, FRA was *not* required to prepare an EIS to evaluate the impacts that may result from the Tier III rule.

**H.     FRA issues a notice proposing the RPA—the major federal action requiring review under NEPA—nearly six years *after* the NEPA process began.**

173.    Although FRA issued its Tier III regulations to address equipment, track, operating practices, and human factors for existing, conventional HSR systems (those that *are* interoperable), Texas Central's proposed Shinkansen trainsets do not comply with Tier III regulations. As FRA

---

[3] Under FRA Procedure 4(c), certain actions are excluded from the requirements imposed on major federal actions, including the requirement that the action be subjected to environmental review. Section 4(c)(2) excludes "[p]romulgation of railroad safety rules and policy statements that do not result in significantly increased emissions of air or water pollutants or noise or increased traffic congestion in any mode of transportation."

put it, "significant operational and equipment differences exist between [Texas Central's proposed Shinkansen system] and existing passenger operations in the United States."

174.    FRA estimated it would cost around $4.7 million per trainset to modify the Shinkansen equipment to meet Tier III regulations, but Texas Central stated publicly that it will not make these modifications. Instead, Texas Central insisted on proceeding with its petition for an RPA in hopes FRA would carve out special, accommodating standards that would apply only to its incompatible Shinkansen trainsets—and FRA obliged.

175.    FRA granted Texas Central's rulemaking petition on August 30, 2019 and published a notice of proposed rulemaking ("NPRM") on March 10, 2020. According to FRA, the NPRM proposed safety standards to enable safe operations of Texas Central's proposed HSR and a deferential, alternate method for safety oversight—*i.e.*, a "rule of particular applicability."

176.    Even though FRA stated in its Tier III regulations that it would be "very costly" for an outlier standalone system (like Texas Central's) "to attempt to connect with major metropolitan areas," it claimed that entities (like Texas Central) considering such outlier standalone systems would "voluntarily assume the higher costs of building new infrastructure, knowing they cannot take advantage of the costs savings from sharing existing infrastructure."

177.    FRA presented no evidence of this startlingly generalized proposition and, in fact, it is contradicted by Texas Central's refusal to spend $4.7 million per trainset to meet Tier III regulations—a mere pittance considering the obscene costs of new, additional, environmentally-damaging infrastructure. Moreover, FRA admitted it had not made "any determination regarding the potential financial viability of [Texas Central's] proposal, even under the terms of this NPRM."

178.    FRA claimed further that "there are no assumed new costs associated with the NPRM, as any additional burdens placed onto [Texas Central] are voluntarily assumed." But it

undertook no investigation to determine whether Texas Central had the means to bear these substantial associated costs, ignoring the fact that if it cannot, these costs will be shifted to, and borne by, state and local governments and, ultimately, taxpayers. Nor was FRA in a position to undertake such an investigation, given its prior admission that it "does not maintain financial information on [Texas Central]."

**FRA identifies (but summarily rejects) the only two alternatives to the RPA.**

179.    In the NPRM, FRA identified only two alternatives to the proposed RPA: a so-called "No Build Alternative" and the "Waivers of Compliance" alternative.

180.    FRA stated that under the No Build Alternative, Texas Central could decide *not* to pursue construction of the proposed Shinkansen system and instead pursue construction of a Tier III-compliant system using modified Shinkansen trainsets. However, FRA speculated that Central Japan Railway "would most likely not allow" Texas Central to use its technology if it had to be modified to meet Tier III standards. There was no reason for FRA to speculate as to what Central Japan Railway might do if Texas Central chose to modify the Shinkansen trainsets, as Texas Central had already made clear it would not incur the costs to do so.

181.    According to FRA, if Texas Central was forbidden from modifying the Shinkansen trainsets, it would be required to design and develop "a brand new high-speed system," resulting in "high costs" and "high levels of uncertainty associated with the overall safety performance of the system." FRA believed it was "unlikely that [Texas Central] would build this system under this alternative." There was no reason for FRA to speculate as to what Texas Central might do under this alternative either. If it would not even consider paying the relatively nominal costs of modifying the Shinkansen trainsets, surely Texas Central would not agree to start all over with "a brand new" HSR system.

182.     As for the second alternative, FRA said that Texas Central could apply for waivers, the continual renewal of which "would impose a large paperwork burden on [Texas Central]." And, because waivers are revocable, FRA commented that any approvals issued through waivers "can be subject to change and conditions."

183.     FRA also expressed concern that the "uncertainty of the longevity of waiver approval could hinder the financing and implementation of [Texas Central's] system" and, in addition to this "investor uncertainty," revocation of any waivers could potentially necessitate the stoppage of Texas Central's HSR, "which would have a large impact on passengers who desire to use the [HSR] system."

**FRA fails to prepare an EIS to evaluate the impacts of the proposed RPA.**

184.     In contrast to issuance of its Tier III regulations, FRA recognized that the proposed RPA would *not* be categorically excluded from detailed environmental review under section 4(c). Thus, FRA would be required to prepare an EIS to evaluate the impacts of the RPA.

185.     In the Environmental Impact section of the NPRM, FRA claimed it was, in fact, "evaluating the potential impacts that may result from this proposed Rule." FRA then referred to the Draft EIS and soon-to-be-released Final EIS, implying that those documents were prepared for this purpose. But FRA did not prepare the Draft EIS to evaluate the impacts of the RPA and, as a result, neither the Draft EIS nor the soon-to-be-released Final EIS contained any such evaluation.

**I.     As the COVID-19 pandemic escalates, FRA refuses to postpone in-person public comment hearings on the NPRM; it holds them by phone instead.**

186.     Publication of the NPRM opened the public comment period, which was initially scheduled to close on May 11, 2020. FRA announced it would hold three public hearings on the NPRM between March 31 and April 2, 2020. However, due to the COVID-19 pandemic, FRA postponed the hearings on March 30, 2020, the day before they were set to commence.

187.     On April 16, 2020, FRA announced it had decided to convene the public hearings telephonically on three consecutive days between May 4 and 6, 2020. FRA claims its "choice" to conduct these hearings by phone "represented merely a change in the manner of public engagement" and "no technology beyond a telephone was necessary for participation."[4]

188.     In making this choice, FRA ignored numerous requests—from U.S. Congressman Kevin Brady, Texas State Representatives, and others—to cancel the virtual hearings due to concerns over the lack of reliable high-speed internet access, or postpone them until they could safely be held in-person. FRA's "choice" to hold virtual hearings on the NPRM prevented hundreds, if not thousands, of affected parties from participating in the EIS process.

**J.     Prior to release of the Final EIS, Texas Central admits the Project will cost at least $30 billion and will not be privately financed.**

189.     On April 8, 2020—a month before FRA signed the Final EIS and less than a month after FRA claimed Texas Central would voluntarily assume the substantial added costs associated with the RPA—Texas Central Chairman Drayton McLane made two startling admissions.

190.     First, McLane admitted costs had ballooned *to at least $30 billion*, lamenting that "the project has turned into a $30B project and we have certainly hit a snag with all of the difficulties of the Corona Virus." When asked about this estimate, Texas Central CEO Carlos Aguilar described it as "a conservative estimate of 'all in' numbers," conceding that the true cost will exceed $30 billion.

---

[4] During the 77-day Draft EIS comment period, FRA received 20,848 submissions from approximately 6,000 individuals, agencies, elected officials, businesses, and organizations. In addition, 2,971 individuals attended the in-person hearings, more than 2,000 of whom gave oral or written testimony. In sharp contrast, during the 77-day NPRM comment period, FRA received a mere 287 written comment submissions and only 52 individuals provided testimony.

191.     Second, McLane admitted the Project will *not* be "financed entirely by investors and entrepreneurs," as FRA had falsely represented in the Draft EIS (and would falsely represent in the Final EIS a month later). Rather, McLane confirmed Texas Central's intention to rely on funding "from President Trump's infrastructure stimulus through the Department of Transportation," a fact CEO Aguilar later confirmed. To date, Texas Central has received no stimulus money.

192.     These admissions were extremely concerning, especially when viewed in the context of previously concealed facts that had come to light just months earlier. In August 2019, Texas Central admitted in sworn documents submitted to another federal agency that it had raised only $450 million in financing. This relatively paltry amount, which includes a $300 million loan from the Japan Bank of International Cooperation, accounts for merely 1.5% of the Project's current estimated costs. Regarding Texas Central's glaring lack of financing, CEO Aguilar admitted he does not know if financing is "going to be there or not."

193.     In March 2020, Texas Central laid off 28 employees, including executive level, public relations, and field staff positions. According to Aguilar, Texas Central "ha[s] been forced to make hard decisions in an effort to make the best use of our current funding."

194.     To put it mildly, it had become abundantly clear that Texas Central could *not* "voluntarily assume the higher costs of building new infrastructure," as FRA had baselessly predicted Texas Central would be willing and able to do. Yet, FRA plowed ahead.

**K.     FRA publishes the Final EIS.**

195.     FRA signed the Final EIS on May 15, 2020, and it was published in the Federal Register on May 29, 2020.

**FRA falsely (and confusingly) claims the Final EIS evaluates the impacts that may result from the RPA.**

196.     FRA did not even make it through the abstract of the Final EIS without blatantly mischaracterizing its content. In the very first paragraph, FRA claimed the Final EIS "assesses the potential beneficial and adverse environmental impacts of FRA's proposed rulemaking to enable effective safety oversight of the operation of an HSR system based on the … Shinkansen technology that is described in a Petition for Rulemaking for [an RPA] submitted by Texas Central." This was demonstrably false.

197.     As previously explained, FRA published its 2014 Notice of Intent to prepare an EIS to evaluate the "impacts of constructing and operating" the Project, "route alternatives for passenger rail for the corridor between Dallas and Houston," and "alternatives for construction and operation of the Proposed Action." FRA did not mention anything relating to any evaluation of impacts that may result from any "proposed rulemaking" or RPA.

198.     In addition, the Draft EIS expressly stated that it purportedly evaluated the impacts that may result from Texas Central's proposal "to construct and operate" the Project. Given FRA's admission that it did *not* evaluate the impacts that may result from the RPA in the Draft EIS, its claim that it evaluated such impacts in the Final EIS defies logic.

199.     Two paragraphs later in the Final EIS, FRA added to the confusion: "This document evaluates and documents the reasonably foreseeable potential beneficial and adverse environmental impacts of implementing [Texas Central's] HSR system *in any location*." (emphasis added). Of course, FRA had not evaluated the impacts of implementing the proposed Shinkansen system "in any location." Rather, the Final EIS evaluated the impacts of "six Build Alternatives between Dallas and Houston"—*i.e.*, impacts that may result from "construction and

operation" of the Project (not from the RPA) along a preferred alignment between Dallas to Houston (not anywhere).

200.    Later, in a section titled "Scope of this Document," FRA tried to clean up its mess. According to FRA, because the proposed RPA would enable safe operations of the proposed Shinkansen system "independent of location," the Final EIS purportedly evaluated the impacts of implementing the Shinkansen system "in any other location." And, FRA claimed its evaluation of impacts that could occur "anywhere" the Shinkansen system might be implemented "is informed by the evaluation of potential impacts between Dallas and Houston."

201.    Head-scratching as it may be, the Final EIS at least shed light on a couple of things. First, the Final EIS revealed Texas Central's (and Central Japan Railway's) true motive. They wanted FRA to issue a rule particularly applicable to the proposed Shinkansen technology, which would allow Central Japan Railway—and only Central Japan Railway—to deploy its Shinkansen trains anywhere in the U.S.

202.    Second, the Final EIS explained why Texas Central forced FRA to remove economic viability from the Project's purpose. In the end, Texas Central and Central Japan Railway do not care how much the Project will ultimately cost to construct. They do not care whether the Project has any chance of meeting their wildly optimistic ridership projections. Nor are they concerned with the undisputed fact that the Project will hemorrhage hundreds of millions of dollars from day one.

203.    Texas Central and Central Japan Railway do not care about these economic realities because they have no intention of footing the bill, however high it may climb. Taxpayers—none of whom voted in favor of this impending disaster—will be stuck with the tab while Central Japan Railway (and its RPA) move on to greener pastures "in any other location" in the U.S.

204.    Setting aside these selfishly obscene motives, none of FRA's NEPA documents even consider the impacts of implementing the Shinkansen technology — even if limited to high-volume traffic paths — across the U.S. But FRA's Tier III analysis recognizes at least part of the truth. The resulting fragmentation would impose a burden on taxpayers who are forced to "eat" the substantial costs associated with implementation of an outlier standalone system (like Texas Central's). And hope for a sensibly interconnected rail network will be forever frustrated.

**Like the Draft EIS before it, the Final EIS evaluates the impacts that may result from construction and operation of the Project.**

205.    FRA dedicated the near entirety of its 11,512-page Final EIS to a purported evaluation of Build Alternatives (mainly Alternatives A, B, C) along various Utility Corridor alignments. FRA arrived at the same conclusion it had preordained in the Draft EIS; its preferred alternative was what Texas Central also preferred — Build Alternative A.

206.    With respect to the No-Build Alternative, FRA stated: "Under the No Build Alternative, FRA would not issue an RPA or take other regulatory action necessary for this [Shinkansen] technology within the U.S.; therefore, [Texas Central] would not be able to operate the HSR system." Thus, according to FRA, the No Build Alternative would "not meet the specified Purpose and Need for this Project, but is retained in the EIS as a basis for comparison."

207.    Yet, the "specified Purpose and Need for this Project" in the Final EIS said nothing about issuance of an RPA; rather, it concerned the provision of "reliable and safe high-speed passenger rail transportation between Dallas and Houston." To meet this purpose, FRA could (and should) have considered a host of reasonable alternatives that did *not* require issuance of an RPA. By its own admission, however, FRA failed to do so.

**FRA fails to disclose and evaluate all impacts that may result from construction and operation of the Project, including hydrologic and flood plain impacts.**

208.    In the Final EIS, FRA failed to take the required hard look at the Project's potential adverse environmental impacts, including but not limited to hydrologic, flood plain, and wetland impacts. In addition, FRA included significant out-of-date information rendering its purported analysis of these impacts obsolete.

209.    For example, FRA admits that the National Oceanic and Atmospheric Administration ("NOAA") is the federal agency charged with tracking and recording rainfall statistics and that NOAA Atlas 14 (released in 2018) is the authoritative source for rainfall data along the Project's proposed route. Yet, FRA mentioned NOAA Atlas 14 only once in the Final EIS (in Appendix F). In addition, FRA admits that it made adjustments reflecting NOAA Atlas 14 in Harris County only. It did not base its analysis of drainage impacts on NOAA Atlas 14 either.

210.    FRA did not perform a detailed analysis of hydrologic impacts using rainfall data from NOAA Atlas 14 of various drainage swales and creeks passing through culverts for the at-grade portions of the Project or under the elevated sections over identified flood plain and wetland areas. Nor did FRA disclose or perform a detailed analysis of the extent of jurisdictional wetland filling that will occur as a result of the construction of the Project.

211.    FRA failed to disclose and evaluate numerous other environmental impacts in the Final EIS. But given the Project's design, FRA's failure to disclose and evaluate the impacts relating to increased rainfall and the obstruction of water flow is the most egregious.

**FRA concedes it skipped a required step in the rulemaking process.**

212.    In a section of the Final EIS titled "Rule of Particular Applicability," FRA listed six "basic steps" it follows during the rulemaking process, "including for an RPA":

1. Identifying the need for the rule (e.g., to address a safety issue or a U.S. Congressional mandate, or in response to a rulemaking petition).
2. Developing the proposed rule.
3. Publishing the Notice of Proposed Rulemaking (NPRM) in the Federal Register and soliciting public comment.
4. Evaluating written comments from the public and, if a public hearing is convened, comments made during a public hearing on the NPRM.
5. Developing the Final Rule.
6. Publishing the Final Rule in the Federal Register.

213.     Between step 3 (publishing the NPRM) and step 4 (evaluating public comments on the NPRM), FRA did not include the required step of preparing an EIS to evaluate the impacts of the proposed rulemaking. It skipped this critically important, required step even though FRA itself had determined the NPRM would *not* be categorically excluded from a detailed environmental review under section 4(c) of FRA's Procedures.[5]

**<u>The Final EIS contains no evaluation of the only two alternatives to the RPA.</u>**

214.     In the NPRM, FRA identified only two alternatives to the RPA: the "No Build Alternative" and the "Waivers of Compliance" alternative.

215.     The No Build Alternative, as described in the NPRM, concerned what Texas Central (and Central Japan Railway) might choose to do if Texas Central was forced to either modify its Shinkansen trainsets to comply with Tier III regulations or abandon the Shinkansen technology altogether. The Final EIS did not evaluate either variant of the No Build Alternative in any manner whatsoever.

216.     FRA did not evaluate the second alternative to the RPA, Waivers of Compliance, either. In the context of the RPA, the term "waiver" does not even appear in the Final EIS.

---

[5] *See* paragraphs 184 to 185 above.

**FRA makes several false statements and inaccurate assumptions in the Final EIS.**

217.     In the Final EIS, FRA made several false claims underlying the Project's economic assumptions. First, FRA falsely claimed that the Project will be "privately financed." Second, FRA falsely claimed the Project would cost "between $16 billion and $19 billion" to construct, despite the fact that Texas Central had admitted just a month earlier that the Project will cost *at least* $30 billion to construct. Third, FRA projected ridership of 6.4 to 6.8 million passengers per year, an approximate 50% increase from its projections in the Draft EIS. Fourth, FRA falsely claimed the Project would generate tens of billions of dollars in economic benefits.

**L.     The Surface Transportation Board flip-flops, asserts jurisdiction over the Project, and tells Texas Central it must apply for a construction permit.**

218.     In April 2016, Texas Central filed a Petition for Exemption before the Surface Transportation Board ("STB"), the agency that oversees construction and acquisition of federally regulated rail lines. In its Petition for Exemption, Texas Central requested that it be exempted from 49 U.S.C § 10901, which governs the authority to construct and operate rail lines in the U.S.

219.     In July 2016, the STB declined jurisdiction over the Project, concluding that "construction and operation of the proposed [Project] would not be part of the interstate rail network and is therefore not subject to the Board's jurisdiction."

220.     In July 2020—at the conclusion of *over four years* of adversarial proceedings—the STB granted Texas Central's Petition to Reopen the proceeding and asserted jurisdiction over the Project. Significantly, however, the STB denied Texas Central's request for an exemption from the full application process required of new rail lines seeking authorization to construct.

221.     In its decision, the STB established that Texas Central cannot begin construction unless and until the STB approves a full application: "[Texas Central's] petition for exemption to

construct will be denied, *and any future request for construction or operation will need to be made by application.*" (emphasis added). Texas Central has yet to submit its application to the STB.

222.    If Texas Central chooses to file an application and pay the $96,600 filing fee, it will have to disclose how it intends to finance the Project and the extent to which funds for financing are presently available, along with a recent balance sheet and income statement. It must also disclose information supporting its ridership projections and financial feasibility. To date, it has been unwilling to disclose this information to the public, the STB, or FRA. The full application process, referred to as a "hard look," is adversarial in nature and will take years to complete.

223.    Assuming Texas Central files an application at some point in time, circumstances will have changed and new information will be available concerning the environment, HSR technology, alternatives to the Project, and travel patterns in the U.S. As such, no meaningful NEPA analysis can be conducted unless and until Texas Central files the required application.

**M.    FRA issues the RPA and the ROD approving the RPA and Final EIS.**

224.    On September 10, 2020, FRA issued the RPA. It was published in the Federal Register on November 3, 2020, with an effective date of December 3, 2020.

225.    According to FRA, "this final [RPA] establishes safety standards" which are *not* intended for general application in the rail industry. Rather, they apply only to Texas Central's proposed HSR. FRA admitted that issuance of the RPA "constitutes a Major Federal Action requiring review under NEPA," and it acknowledged that NEPA's fundamental purpose "is to inform the decisionmaker and the public of the potential environmental impacts that may result from the proposed action." Accordingly, FRA admitted that the required EIS "must be finalized before the agency takes the action that is the subject of the environmental review."

226.    Although FRA correctly spelled out what NEPA requires, it ignored the fact that it published the NPRM—the proposed action requiring review under NEPA—more than five years *after* the EIS process began. It also ignored the fact that the Project's purpose in the relevant EIS documents concerned the evaluation of "route alternatives for passenger rail for the corridor between Dallas and Houston" along with "alternatives for construction and operation of the *Proposed Action* consisting of a sealed HSR corridor." FRA mentioned the RPA only in passing in the EIS documents, as one of several options FRA *may* consider at some point in the future.

227.    Therefore, the "decisionmaker and the public" could *not* have been informed of "the potential environmental impacts that may result from the proposed action" during the NEPA process, as the "action that is the subject of environmental review"—*i.e.*, the RPA—had not even been proposed at the time that process took place, nor would it be proposed until years later.

228.    In the RPA, FRA claimed further that the Final EIS "enables FRA to reach a decision that is informed by an understanding of the potential environmental impacts of this rulemaking." Yet, FRA published its 2014 Notice of Intent to prepare an EIS "for the impacts of constructing and operating" the Project. Therefore, the Final EIS could *not* have enabled FRA to reach an informed decision on the potential impacts of the RPA for two reasons.

229.    First, FRA did not even publish the NPRM until March 10, 2020. As a result, FRA could not have evaluated the impacts of a rulemaking that did not even exist.

230.    Second, FRA prepared its EIS to evaluate the impacts of constructing and operating the Project, and it referred to construction and operation of the Project as the "Proposed Action" requiring review under NEPA. It did not even mention any evaluation of any proposed rulemaking.

**FRA concedes the RPA does not authorize construction or operation.**

231.    Although FRA prepared an EIS to purportedly evaluate the impacts of constructing and operating the Project, the RPA states: "FRA does not grant any kind of construction approval or permit. Neither does this final rule, by itself, grant any permission or authority for [Texas Central] to operate."

232.    In this regard, FRA stated that Texas Central must follow "all applicable Federal, State, and local requirements, *which are separate from FRA's jurisdiction*. This includes the [STB], which issued its decision … finding that *the operation* proposed by [Texas Central] is subject to STB jurisdiction." (emphasis added). In that decision, the STB also found that construction of the Project is subject to its jurisdiction. Simply put, FRA admitted it lacked jurisdiction over the very analysis it had purported to undertake.

233.    In truth, FRA never had authority to approve construction *or* operation of the Project in the first place, which makes its decision to prepare an EIS to study the impacts of construction and operation of the Project impossible to understand. At some point during the EIS process, FRA may have realized it lacked such authority, which may explain why it changed course and began falsely claiming it prepared its EIS to study the impacts of the RPA.

**FRA fails to adequately consider the No Build Alternative.**

234.    In the RPA, FRA stated: "As required by NEPA, the Final EIS included the No Build Alternative, also known as the alternative of no action, in its analysis as the baseline for comparison with Build Alternatives A through F and the three Houston Terminal Station Options." According to FRA, under No Build Alternative, it "would not publish an RPA or take other regulatory action necessary for the implementation of the Tokaido Shinkansen technology within

the U.S.; therefore, [Texas Central] would not construct nor be able to operate the HSR system and associated facilities."

235. But FRA conceded that the RPA "does not grant any kind of construction approval or permit" or "permission or authority for [Texas Central] to operate." As a result, regardless of whether FRA issued the RPA, Texas Central still would not be authorized to construct or operate the Project. In this respect, the Build Alternatives and No Build Alternative were no different.

236. In any event, FRA failed to consider *any* alternatives that did not result in issuance of the RPA to allow implementation of the proposed Shinkansen system between Dallas and Houston. In all respects and at all relevant times, the result was thus preordained.

**FRA did not consider or evaluate the two alternatives to the RPA.**

237. FRA had identified only two alternatives to the RPA: the No Build Alternative and Waivers of Compliance alternative.

238. In its Summary of Alternatives Considered, FRA briefly discussed the No Build Alternative, but only as a "baseline for comparison with Build Alternatives A through F and the three Houston Terminal Station Options." FRA did not discuss any variant of the No Build Alternative as it was described in the NPRM—*i.e.*, what Texas Central might choose to do if forced to either comply with Tier III regulations or design and develop "a brand new" HSR system.

239. With respect to Waivers of Compliance, that term does not even appear in the RPA, and the term "waiver" appears only three times in the Regulatory Action section of the RPA. Neither term appears in the Summary of Alternatives Considered because FRA did not evaluate either alternative.

## FIRST CLAIM FOR RELIEF – VIOLATION OF THE APA

### FRA acted without lawful authority, *ultra vires*, and unconstitutionally.

240.     Plaintiffs incorporate each of the prior paragraphs by reference.

241.     A bedrock principle of the separation of powers doctrine is that no executive agency, or part of an executive agency, may take action that exceeds the authority lawfully granted. The APA embodies this constitutional principle by specifically instructing that a "reviewing court shall … hold unlawful and set aside agency action, findings, and conclusions found to be … in excess of statutory jurisdiction, authority, or limitations, or short of statutory right."[6]

242.     To similar effect in this context, the APA instructs that a "reviewing court shall … hold unlawful and set aside agency actions, findings, and conclusions found to be … contrary to constitutional right, power, privilege, or immunity" or "without observance of procedure required by law."[7] Such *ultra vires* action, findings, and conclusions likewise may be set aside as "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."[8]

243.     All agency actions, findings, and conclusions made without authority are not only unlawful, but also unconstitutional. The constitutional principles take on special meaning when agency violations enable (or may enable) others to trench on vested real property rights.

244.     In addition to the important need to respect constitutional limitations on the exercise of power, institutional considerations underpin limitations in the APA. A central premise for the deference of courts extended (at times) to agency determinations is that the agency has special technical expertise and resources (notably trained personnel) to undertake a chartered mission.

---

[6] 5 U.S.C. § 706(2)(C).

[7] *Id*. § 706(2)(B) and (D).

[8] *Id*. § 706(2)(A).

245. Another central premise is that an agency, by repeatedly undertaking specialized tasks, gains experience that (hopefully) leads to informed decisions. If an agency purports to act outside its charter, it may do more than make an uninformed decision. It may also exclude the possibility of an informed decision by another entity that would and should know better. Put another way, NEPA, at the very minimum, requires a "hard look" at all reasonable alternatives (including the "no action" alternative). However, an agency without lawful authority cannot be the agency to take the requisite "hard look."

246. FRA's inexplicable actions reflect that it not only has no brief to take such action, it also has neither expertise nor experience in relevant areas. Even if it had some expertise or experience tangentially related to the action, findings, and conclusions at issue here, FRA lacks authority to take expansive action so far outside its bailiwick.

247. Whatever may be the extent of FRA authority to evaluate safety of certain railway technology, no federal law gives FRA authority, responsibility, or power (or expertise or experience) to evaluate competing alternatives for transportation (including the no-action alternative). Admittedly, FRA does not oversee construction or operation in any way related to such evaluation.

248. Likewise, no federal law grants FRA authority, responsibility, or power (or expertise or experience) to undertake scoping, prepare a Draft EIS, evaluate and incorporate comments leading to a Final EIS, or approve selection of a route (or accept or reject a no-action alternative) among any options, however chosen.

249. FRA's lack of authority becomes even more apparent insofar as it so greatly departed from standard NEPA practice. Even if a properly empowered agency might have some

basis to make, for example, radical shifts in underlying assumptions of the proposed agency actions (which no agency should have), that is not part of FRA's mission.

250.    An FRA evaluation of whether a particular technology is "safe enough for government approval," or even whether a particular route is "safe enough," might be proper if safety concerned only passenger safety, for example. Of course, that is neither conceded nor at issue in this case. Indeed, FRA did not even propose the safety rule (the RPA) until months before purporting to finalize the EIS. FRA might be able to compare whether the proposed Shinkansen HSR system, which is not interoperable, is as "safe" as established European models, but FRA did nothing of the sort. Considering the scoping, Draft EIS, commenting, Final EIS, and ROD processes, FRA purported to evaluate "Build Alternatives" along alternative routes *only* for Texas Central's proposed HSR, far beyond its federal role.

251.    Notably, FRA initially assured stakeholders that the Project's purpose included economic viability. Institutionally, however, evaluating economic viability – especially as part of construction and operation – is a far cry from evaluating safety. Then, FRA inexplicably removed economic viability from the Project's stated purpose altogether. Nowhere did Congress empower FRA so greatly to change a Project's purpose, let alone in an area so far from the agency's true concerns.

252.    At virtually every stage, FRA was seeking to perform not only outside its league, but outside any sport it knew. Perhaps some other part of the Department of Transportation would be authorized to make decisions at issue here, in which case presumably (or at least hopefully) that agency would have a clue about how to undertake this EIS.

253.    FRA acted *ultra vires* both when it purported to assert authority to evaluate factors and approve alternatives far outside anything authorized by federal law and when it purported to

rely on such an evaluation to support a rule concerning an entirely different issue—*i.e.*, "safety." Insofar as FRA purported to make decisions outside its authority, its action, findings, and conclusions must be found unlawful and set aside.

## SECOND CLAIM FOR RELIEF – VIOLATION OF NEPA

### FRA failed to prepare an EIS to study the impacts that may result from the RPA.

254.    Plaintiffs incorporate each of the prior paragraphs by reference.

255.    NEPA is "our basic national charter for protection of the environment."[9] Congress enacted NEPA to serve two significant purposes: (1) to ensure that federal agencies undertaking a major federal action take a hard look at a proposed project's environmental impacts before deciding how to proceed; and (2) to ensure that relevant information about those impacts and the project's alternatives is made available to provide the public a meaningful opportunity for comment and participation so that decisions are made in light of informed public comment.[10]

256.    To effectuate these purposes, Section 102 of NEPA requires agencies to prepare an Environmental Impact Statement ("EIS") to evaluate the potential environmental consequences of *any* proposed major federal action that significantly affects the quality of the human environment.[11] An EIS is intended "to apprise decisionmakers of the disruptive environmental effects that may flow from their decisions at a time when they 'retain[ ] a maximum range of options.'"[12] Decisions must only be made after environmental documents are completed.

---

[9] 40 C.F.R. § 1500.1(a).

[10] *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989).

[11] 42 U.S.C. § 4332; *Coliseum Square Ass'n, Inc. v. Jackson*, 465 F.3d 215, 228 (5th Cir. 2006).

[12] *Chilkat Indian Vill. of Klukwan v. Bureau of Land Mgmt.*, 825 F. App'x 425, 427 (9th Cir. 2020).

Otherwise, "the process becomes a useless ritual, defeating the purpose of NEPA, and rather making a mockery of it."[13]

257.    In 2014, FRA published a notice of intent to prepare an EIS to study "the impacts of constructing and operating a dedicated (HSR) system." In the Notice, FRA referred to construction and operation of the Project as the "Proposed Action"—*i.e.*, the major federal action requiring review "pursuant to NEPA."

258.    In the Draft EIS published in 2017, FRA stated, "[t]his EIS documents FRA's evaluation of [Texas Central's] proposal to construct and operate a 240-mile, for-profit, [HSR] system connecting Dallas and Houston using the … Shinkansen technology." The Draft EIS did *not* evaluate the adverse environmental impacts that may result from the RPA—nor could it have, as FRA did not publish its notice proposing the RPA until March 10, 2020.

259.    In the Final EIS published in May 2020, FRA stated: "This document evaluates and documents the potential beneficial and adverse environmental impacts of FRA's proposed [RPA] to enable effective safety oversight of the operation of a [HSR] system." In fact, the Final EIS did *not* evaluate any such impacts that may result from the RPA, as FRA had issued its notice proposing the RPA a mere three months prior to publishing the 11,512-page Final EIS.

260.    Even if FRA had, in the Final EIS, attempted to evaluate the impacts that may result from the RPA, it did so only after scoping had been conducted and public comments had been submitted on the Draft EIS, which FRA had undertaken to study the impacts of constructing and operating the Project.

261.    FRA *never* subjected the RPA to a full EIS process (or even a partial one). Consequently, FRA *never* fully and properly evaluated the environmental impacts that may result

[13] *National Resources Defense Council v. Callaway*, 524 F.2d 79, 92 (2nd Cir. 1975).

from the RPA on its own merits, as NEPA requires. Rather, FRA merely hijacked the six-year EIS process at its tail end in a misguided, futile attempt to use the Final EIS to satisfy its NEPA obligation and justify its inexplicable, preordained decision to issue the RPA.

262. In violation of NEPA's fundamental requirement, Defendants issued the RPA prior to preparing an EIS to study the impacts that may result from the RPA. FRA thus failed to evaluate the potential adverse environmental impacts of its major federal action. Defendants' failure to comply with NEPA's most basic requirement renders their decision to issue the ROD approving the RPA and Final EIS a violation of NEPA and the APA, arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law.

## THIRD CLAIM FOR RELIEF - VIOLATION OF NEPA

### FRA failed to adequately consider all reasonable alternatives to the RPA.

263. Plaintiffs incorporate each of the prior paragraphs by reference.

264. Consideration of alternatives is the heart of an EIS, which is why agencies must rigorously explore and objectively evaluate "all reasonable alternatives that relate to the purposes of the project and briefly discuss the reasons for eliminating any alternatives from detailed study."[14] NEPA further requires that an EIS "devote substantial treatment to each alternative considered in detail so that reviewers may evaluate their comparative merits."[15] The "existence of a viable but unexamined alternative renders an [EIS] inadequate."[16]

---

[14] *Alaska Survival v. Surface Transp. Bd.*, 705 F.3d 1073, 1087 (9th Cir. 2013); *see also* 40 C.F.R. § 1502.14(a).

[15] *Audubon Soc'y of Greater Denver v. United States Army Corps of Engineers*, 908 F.3d 593, 599 (10th Cir. 2018); *see also* 40 C.F.R. § 1502.14(b).

[16] *High Country Conservation Advocates v. United States Forest Serv.*, 951 F.3d 1217, 1223 (10th Cir. 2020).

265.     In its Notice of Proposed Rulemaking concerning the RPA published in March 2020, FRA identified only two alternatives to the RPA: the No Build Alternative and Waivers of Compliance alternative. FRA failed to identify and consider other reasonable alternatives, including Tier III-compliant HSR systems and HSR systems under the European model. FRA also failed to consider other reasonable alternatives, including the alternative of requiring Texas Central to modify its proposed Shinkansen technology to comply with Tier III regulations.

266.     Even worse, FRA did not adequately consider and evaluate the only two alternatives it did identify in the NPRM. In the Draft EIS published in December 2017, FRA did not evaluate either alternative—nor could it have, as FRA did not publish the NPRM identifying the two alternatives until fifteen months *after* publication of the Draft EIS. Because those two alternatives were not disclosed in the Draft EIS, the public was not afforded an opportunity to comment on them or propose other reasonable alternatives.

267.     In addition, FRA centered its discussion of the No Build Alternative in the NPRM on what might happen if Texas Central was forced to modify its equipment to comply with Tier III regulations. However, FRA did not issue its Tier III regulations until November 2018—nearly a year *after* publication of the Draft EIS. As a result, FRA could not have considered the No Build Alternative to the RPA—as identified in the NPRM—in the Draft EIS published in 2017. Likewise, the public was not afforded an opportunity to comment on FRA's evaluation of this RPA alternative, as it was not identified or evaluated in the Draft EIS (nor could it have been).

268.     Similarly, the Final EIS contains no evaluation of the two RPA alternatives. FRA included the No Build Alternative in the Final EIS "as the baseline for comparison with the Project (Build Alternatives A through F and Houston Terminal Station Options)." The Final EIS did not include *any* discussion of Tier III regulations in its evaluation of the No Build Alternative or in

any other context, nor did it contain *any* discussion of the Waivers of Compliance alternative in *any* context. In fact, that term is never even mentioned in the Final EIS.

269.    In the RPA published in November 2020, FRA fared no better. In its Summary of Alternatives Considered, FRA discussed "six end-to-end Build Alternatives" and the No Build Alternative, but conceded that it had included the No Build Alternative for evaluation as a "baseline for comparison with Build Alternatives." FRA's discussion of the No Build Alternative concerned none of the issues raised in the NPRM—*e.g.*, what Texas Central might choose to do if forced to comply with Tier III regulations or design "a brand new high-speed system."

270.    With respect to the Waivers of Compliance alternative, that term does not appear in the RPA, and the term "waiver" appears only three times in the Regulatory Action section of the RPA. Not surprisingly, neither term appears in the Summary of Alternatives Considered, as FRA never evaluated the Waivers of Compliance alternative in the Draft or Final EIS.

271.    It was arbitrary and capricious or otherwise a violation of law for FRA to publish a Final EIS that lacks a full and fair evaluation of all reasonable alternatives to the RPA. Defendants' failure to consider all reasonable alternatives to the RPA renders their decision to issue the ROD approving the RPA and Final EIS a violation of NEPA and the APA, arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law.

## FOURTH CLAIM FOR RELIEF - VIOLATION OF NEPA

## FRA failed to adequately consider all reasonable HSR alternatives.

272.    Plaintiffs incorporate each of the prior paragraphs by reference.

273.    In the Final EIS, FRA stated: "The purpose of the privately proposed Project is to provide the public with reliable and safe HSR transportation between Dallas and Houston." Yet, FRA considered only alternatives that would result in the implementation of Texas Central's

proposed Shinkansen technology. FRA failed to consider alternatives that were equally (or more) capable of providing reliable and safe HSR transportation between Dallas and Houston.

274. Most notably, FRA failed to consider the reasonable HSR alternative of interoperative use of existing facilities—*e.g.*, an HSR system under the European model. These Tier III-compliant models operate on existing rights-of-way and share infrastructure with existing rail lines in urban areas. As a result, these alternatives would not require the construction of exclusive rights-of-way in urban areas, thereby reducing negative impacts on the environment.

275. Instead of exploring the European model and other HSR alternatives, FRA considered only Texas Central's proposed Shinkansen system that is not interoperable or compliant with Tier III regulation, and which would require 240 miles of new, fully sealed right-of-way and new facilities and infrastructure. FRA's failure to consider the European model is inexplicable, given that it recognized in its Tier II regulations that the European model would have significantly fewer impacts on the human environment.[17]

276. It was arbitrary and capricious or otherwise a violation of law for FRA to publish a Final EIS that lacks a full and fair evaluation of all reasonable HSR alternatives. Defendants' failure to consider *all* reasonable HSR alternatives renders their decision to issue the ROD approving the RPA and Final EIS a violation of NEPA and the APA, arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law.

**FIFTH CLAIM FOR RELIEF – VIOLATION OF NEPA**

**FRA failed to adequately consider all reasonable alignment alternatives.**

277. Plaintiffs incorporate each of the prior paragraphs by reference.

---

[17] *See* Passenger Equipment Safety Standards; Standards for Alternative Compliance and High-Speed Trainsets, 83 Fed. Reg. 59,184.

278.     Pursuant to NEPA, an EIS "shall briefly specify the underlying purpose and need to which the agency is responding in proposing the alternatives included in the proposed action."[18] The range of alternatives to be considered in an EIS is dictated by this statement of purpose and need, and "[n]o decision is more important than that delimiting what these 'reasonable alternatives' are."[19] Thus, a proper purpose and need statement is the *sine qua non* starting point for any adequate environmental analysis.

279.     During the scoping process, FRA repeatedly (and sensibly) assured stakeholders the Project's purpose included economic viability. In fact, FRA followed Texas Central's lead in double-weighting economic viability as a factor in assessing which of a set of nine alternative alignments (routes) would be recommended for elimination from further evaluation.

280.     Based on this analysis, FRA eliminated eight of the nine alternative alignments, all of which were reasonable, from "further evaluation in the Draft EIS." These alternatives—the Utility Corridor with I-45 Option, BNSF Options 1, 2, 3 and 4, the UPRR Option, the I-45 Option, and the I-45 Hardy Option—were not adequately considered, explored, or evaluated. Rather, FRA eliminated them from consideration before preparation of the Draft EIS even began.

281.     After eliminating these eight alternatives on the basis that they could not meet the Project's purpose "to provide reliable, safe and *economically viable* high-speed passenger transportation," FRA inexplicably removed economic viability from the Project's purpose in the Draft EIS. According to FRA, economic viability was merely "an objective" of Texas Central's, "not a component of the Project Purpose." Regardless of the reason(s) for its removal, FRA disregarded economic viability as a factor in evaluating alternatives in the Draft EIS.

---

[18] 40 C.F.R. § 1502.13.

[19] *Simmons v. U.S. Army Corps of Eng'rs*, 120 F.3d 664, 666 (7th Cir. 1997).

282.    Having materially revised the Project's purpose to remove the very factor that resulted in elimination of at least eight reasonable alternative alignments, FRA should have reinserted those reasonable alternatives, among others, into the EIS process for further evaluation and to be considered, explored, and evaluated with this revised purpose in mind.

283.    It was arbitrary and capricious or otherwise a violation of law for FRA to publish a Final EIS that lacks a full and fair evaluation of all reasonable alternative alignments. Defendants' failure to adequately consider *all* reasonable alternative alignments renders their decision to issue the ROD approving the RPA and Final EIS a violation of NEPA and the APA, arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law.

### SIXTH CLAIM FOR RELIEF – VIOLATION OF NEPA

### FRA failed to adequately consider the no action alternative.

284.    Plaintiffs incorporate each of the prior paragraphs by reference.

285.    Under NEPA's implementing regulations, agencies are obligated to provide a thorough analysis of the "no action" alternative, which "allows policymakers and the public to compare the environmental consequences of the status quo to the consequences of the proposed action."[20] The no action alternative "is meant to provide a baseline against which the action alternative" may be compared.[21]

286.    In the Final EIS, FRA referred to the "no action" alternative as the "No Build Alternative." Under the No Build Alternative, FRA "would not issue an RPA or take other regulatory action necessary for the implementation of this [Shinkansen] technology within the U.S.; therefore, [Texas Central] would not construct or be able to operate the HSR system and

---

[20] *Ctr. for Biological Diversity v. U.S. Dep't. of Interior,* 623 F.3d 633, 642 (9th Cir. 2010).

[21] *Id.*

associated facilities." In short, FRA dismissed the No Build Alternative merely because it did not result in issuance of an RPA to allow Texas Central to construct and operate the Project between Dallas and Houston. In all respects, elimination of the No Build Alternative was preordained.

287.    Had FRA properly analyzed the No Build Alternative as NEPA requires, it would have considered the economic assumptions and other justifications Texas Central offered for its Project. Among these were wildly unrealistic ridership projections contained in an appendix to the Final EIS ("Ridership Appendix"). If the projections cannot be met, vehicles will not be diverted from Interstate 45 and none of the supposed benefits of the Project will be realized, at great economic and environmental expense.

288.    The Ridership Appendix includes the following chart, which summarizes the ridership forecasts for the Project:

| Table 13.  Constrained versus Unconstrained Ridership Forecast | | | |
|---|---|---|---|
| Year | Unconstrained Forecast (millions) | Constrained Forecast (millions) | Percent Change |
| 2029 | 6.8 | 6.4 | -5.9% |
| 2050 | 13.9 | 13.3 | -4.3% |
| Source: TCHST Ridership Report | | | |

These projections reflect an approximate 50% increase from those contained in the Draft EIS.

289.    For many reasons, all of which were communicated to FRA during the Draft EIS comment period, these projections of 6.4 to 6.8 million annual passengers are grossly exaggerated.

**Common sense dictates the ridership projections are greatly exaggerated.**

290.    Annual projections of 6.4 to 6.8 million passengers equate to roughly 17,500 to 19,700 passengers per day, respectively. By comparison, roughly 2,500 passengers flew between Dallas to Houston per day from 2017 Q1 through 2018 Q4.  Assuming *all* of these airline

passengers diverted to high-speed rail, an additional 15,000 to 17,000 vehicle travelers—each and every day—would also have to divert to high-speed rail to meet the projections in the Final EIS.

291.     The heavily trafficked Union Station in Washington, D.C., which has been in service since 1907, served approximately five million passengers annually pre-COVID, including a large number of daily commuters who transfer to the subway to get to work and travelers headed to BWI Airport. The Project will serve neither of these constituencies in Dallas or Houston—nor could it—as the Project, by design, is not interoperable.

292.     In Philadelphia, 30th Street Station transported approximately 4.3 million passengers annually pre-COVID. According to the Final EIS, the Project will somehow exceed these ridership numbers by millions.

### <u>Independent infrastructure experts concluded the Project will "fail spectacularly."</u>

293.     In 2013, Baruch Feigenbaum, a transportation infrastructure expert from non-partisan think tank Reason Foundation, examined the prospects for high-speed rail in the U.S.[22] Feigenbaum noted that only two high-speed rail lines in the world are profitable: Paris-Lyon in France and Tokyo-Osaka in Japan. He concluded that most U.S. high-speed rail lines would "lose substantial amounts of funds. Only the Northeast Corridor could potentially break even."

294.     In 2017, after a thorough analysis of the Project at issue here, Feigenbaum published both a summary and 65-page detailed analysis of his findings.[23] In contrast to the projections contained in the Final EIS, Feigenbaum projected annual ridership at about 1.4 million

---

[22] Baruch Feigenbaum, *High-Speed Rail in Europe and Asia: Lessons for the United States*, Reason Foundation (May 2013), https://reason.org/wp-content/uploads/2013/05/high_speed_rail_lessons.pdf.

[23] Baruch Feigenbaum, *Texas High Speed Rail Requires Caution – Summary Report*, Reason Foundation (Feb. 6, 2017), https://reason.org/wp-content/uploads/files/texas_high_speed_rail.pdf.

Baruch Feigenbaum, *Texas High Speed Rail Requires Caution – Detailed Analysis*, Reason Foundation (Feb. 2017), https://reason.org/issue-brief/texas-high-speed-rail-requires-caution/.

passengers, noting that Texas Central's "ridership projection of 4 to 5 million annual passengers [in the Draft EIS] is not grounded in reality."[24] He expressed concern that Dallas and Houston "are poster children for big cities where high-speed rail has no chance of succeeding without public funding" and that the Project "will fail so spectacularly that privately financed U.S. high-speed rail lines may never be given a second chance."

295.    Feigenbaum later updated his analysis due to the substantial increase in annual ridership projections in the Final EIS and the escalating COVID-19 pandemic.[25] Feigenbaum stressed that while Texas Central's initial projections "were not grounded in reality," its "new ridership projection of six million passengers is a fantasy."

**TxDOT concluded the Project's ridership projections are grossly overestimated.**

296.    The Texas Department of Transportation ("TxDOT"), a state agency with decades of experience analyzing massive infrastructure projects, also concluded that the ridership projections in the Final EIS are grossly exaggerated. In 2013, prior to providing technical assistance to FRA in preparing the Draft and Final EIS, TxDOT forecasted 2035 annual ridership between 0.7 - 2.7 million passengers for the Project.[26]

---

[24] According to Feigenbaum, this initial, inflated estimate of four to five million passengers was based on a low ticket price ($50), high price of a competing air travel, high rate of induced travelers (those who would not have made the trip but for the Project), higher train speeds (over 200 mph) than practical, and a higher diversion rate from passenger vehicles to high-speed rail than seen anywhere in the world.

[25] Baruch Feigenbaum, *COVID-19 and Soaring Costs are New Challenges for Texas High-Speed Rail Line*, REASON FOUNDATION (July 27, 2020), https://reason.org/policy-brief/covid-19-and-soaring-costs-are-new-challenges-for-texas-high-speed-rail-line/.

[26] TEXAS DEPARTMENT OF TRANSPORTATION, *Texas Statewide Ridership Analysis Report Statewide Analysis Model – Version 2.5* (2013), https://ftp.dot.state.tx.us/pub/txdot-info/rail/rail-ridership-report-1213.pdf.

**FRA's former Chief Maglev Scientist concluded the Project is destined for "certain failure."**

297. John T. Harding, Ph.D., former Chief Maglev Scientist for FRA, also concluded that Texas Central's ridership projections were greatly exaggerated to the tune of almost six times his own. Using Texas Central's projections and cost estimates, he concluded the Project would run an annual loss of $250 million and found that there appeared to be no reasonable likelihood that Texas Central could repay any debt, much less cover operating costs, with a realistic appraisal of ridership. According to Dr. Harding, the Project is destined for "certain failure."

**Had FRA properly evaluated the No Build Alternative as NEPA requires, it would have recognized it as a viable alternative.**

298. Combined with the Project's skyrocketing costs, the wildly optimistic ridership projections contained in the Final EIS are a recipe for financial disaster. If the Project proceeds to construction, it will likely result in a half-built train wreck. Or, in the unlikely event construction is ever completed, the Project will likely be abandoned when funds dry up and Texas Central cannot service its debt. When abandoned, no other rail system could take its place, as the Project is not interoperable. Either scenario would result in avoidable, colossal waste and come at great environmental expense.

299. It was arbitrary and capricious or otherwise a violation of law for FRA to publish a Final EIS that lacks a full and fair evaluation of the no action alternative. Defendants' failure to adequately consider the no action alternative renders their decision to issue the ROD approving the RPA and Final EIS a violation of NEPA and the APA, arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law.

**SEVENTH CLAIM FOR RELIEF – VIOLATION OF NEPA**

**FRA failed to fully disclose all hydrologic, floodplain, and wetland impacts.**

300.    Plaintiffs incorporate each of the prior paragraphs by reference.

301.    NEPA is intended to help public officials make decisions that are based on understanding of environmental consequences, and take actions that protect, restore, and enhance the environment.[27] "Accordingly, NEPA requires federal agencies to assess and publicly disclose the environmental impacts of proposed federal actions."[28]

302.    If ever constructed, the Project would encompass a 240-mile-long, 40-foot-high, 350-foot-wide HSR system bisecting Texas from Dallas to Houston. Although the Project will be elevated, FRA has yet to identify which portions will be elevated on a 20-foot-high earthen berm and which portions will be elevated on a concrete viaduct. Consequently, FRA has not evaluated the impacts that may result from any such elevation.

303.    Where the earthen berm is constructed at grade, the flow and movement of surface water in flood plains would necessarily be diverted or impounded behind the berm unless adequate consideration were incorporated into the Project's design.

304.    Due to climate change, rainfall amounts in Houston and other areas along the Project's proposed alignment have been steadily increasing. According to NOAA Atlas 14, the 100-year rainfall has increased from approximately thirteen inches in Harris County to almost seventeen inches in a 24-hour period. In the Final EIS, FRA provides no indication or explanation of how the Project's design will incorporate and account for these increased (and increasing)

---

[27] 40 C.F.R. § 1500.1.

[28] *W. Watersheds Project v. Grimm*, 921 F.3d 1141, 1143–44 (9th Cir. 2019).

rainfall levels even though every flood plain crossing, wetland area, creek crossing, and drainage swell will be impacted by this increased rainfall event.

305.    The Project is essentially a levee extending across 240 miles of rural countryside. Yet, FRA failed to disclose the hydrologic impacts on properties directly along the Project's proposed alignments. It is therefore impossible to determine from the Final EIS what the Project's impacts on the private properties of hundreds of landowners along the route may be.

306.    It was arbitrary and capricious or otherwise a violation of law for FRA to publish a Final EIS that lacks a full and fair evaluation of the hydrologic and related impacts that may result from the Project and all reasonable alternatives. Defendants' failure in this regard renders their decision to issue the ROD approving the RPA and Final EIS a violation of NEPA and the APA, arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law.

## EIGHTH CLAIM FOR RELIEF – VIOLATION OF NEPA

### FRA failed to adequately consider numerous adverse environmental impacts.

307.    Plaintiffs incorporate each of the prior paragraphs by reference.

308.    Pursuant to NEPA, an agency must "consider every significant aspect of the environmental impact of a proposed action."[29] Agencies must "take a 'hard look' at [the] environmental consequences" of their actions, and "provide for broad dissemination of relevant environmental information."[30] This "hard look" requirement also applies to the "authorization or permitting of private actions" like the Project at issue here.[31]

---

[29] *Baltimore Gas & Elec. Co. v. NRDC*, 462 U.S. 87, 97 (1983).

[30] *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989).

[31] *Sierra Club v. U.S. Army Corps of Engineers,* 803 F.3d 31, 36-37 (D.C. Cir. 2015).

309.     FRA failed to take the required hard look at the Project's potential adverse environmental impacts, including hydrologic, flood plain, and wetland impacts.

310.     Defendants' failure to take a hard look at the adverse environmental impacts that may result from the Project, including all direct, indirect, and cumulative impacts, renders their decision to issue the ROD approving the RPA and Final EIS a violation of NEPA and the APA, arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law.

### NINTH CLAIM FOR RELIEF – VIOLATION OF NEPA

### FRA impaired fair consideration of the Project's adverse environmental impacts.

311.     Plaintiffs incorporate each of the prior paragraphs by reference.

312.     NEPA requires agencies to balance a project's economic benefits against its environmental effects.[32] "An EIS may be deficient if its assessment of the costs and benefits of a proposed action relies upon 'misleading economic assumptions.'"[33] An EIS that relies on misleading economic information or fails to include all relevant costs in its economic analysis violates NEPA because it cannot fulfill NEPA's purpose of providing decisionmakers and the public a valid foundation on which to judge proposed projects.[34]

313.     If economic information is included in an EIS, it must be accurate. "Inaccurate economic information may defeat the purpose of an EIS by impairing the agency's consideration of the adverse environmental effects and by skewing the public's evaluation of the proposed agency action."[35]

_____

[32] *Webster v. U.S. Dep't of Agric.*, 685 F.3d 411, 430 (4th Cir. 2012).

[33] *Id.* (citing *Hughes River Watershed Conservancy v. Glickman*, 81 F.3d 437, 446 (4th Cir.1996)).

[34] *See, e.g., ONRC v. Marsh*, 832 F.2d 1489, 1499 (9th Cir. 1987); *Animal Defense Council v. Hodel,* 840 F.2d 1432, 1439 (9th Cir. 1988).

[35] *Natural Resources Defense Council v. U.S. Forest Service*, 421 F.3d 797, 811 (9th Cir. 2005).

314.     An EIS must also be prepared with objective good faith.[36] "Agencies shall insure the professional integrity, including scientific integrity, of the discussions and analyses in environmental impact statements. They shall identify any methodologies used and shall make explicit reference by footnote to the scientific and other sources relied upon for conclusions in the statement."[37] Although an agency may employ outside consultants in preparing an EIS, it may not "reflexively rubber stamp" information prepared by others.[38]

315.     In the Final EIS, FRA included and relied on incomplete, inaccurate, and misleading economic information and assumptions, faulty data, and flawed methodologies, all of which obscured the relative merits of the Project from the public and significantly skewed the balance of the environmental and economic costs and benefits.

316.     For example, the Ridership Appendix contains flawed data and methodologies and inaccurate assumptions. As another example, the Final EIS contains inaccurate and misleading information concerning how much it will cost to construct the Project. The Final EIS also falsely states that the Project will be privately financed and will generate billions in economic benefits.

317.     Even under the most narrowly focused review, the economic assumptions in the Final EIS are so distorted as to impair fair consideration of the Project's potential adverse environmental impacts. If complete, truthful, and accurate information were included in a supplemental EIS, it would very likely lead to a decision to abandon the Project entirely.

318.     Defendants' inclusion and reliance on inaccurate economic information and assumptions in the Final EIS renders their decision to issue the ROD approving the RPA and Final

---

[36] *See, e.g.*, *Defs. of Wildlife v. Salazar*, 698 F. Supp. 2d 141, 149 (D.D.C. 2010), aff'd, 651 F.3d 112 (D.C. Cir. 2011).

[37] 40 C.F.R. § 1502.23.

[38] *Coliseum Square*, 465 F.3d at 236 (citing *Save Our Wetlands, Inc. v. Sands,* 711 F.2d 634, 643 (5th Cir.1983)).

EIS a violation of NEPA and the APA, arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law.

## TENTH CLAIM FOR RELIEF – VIOLATION OF NEPA

**FRA failed to prepare a supplemental EIS despite significant changed circumstances.**

319.     Plaintiffs incorporate each of the prior paragraphs by reference.

320.     An agency's obligation to evaluate the environmental impacts of a proposed action using accurate and up-to-date information continues throughout the NEPA review process, including *after* an EIS has been finalized. An EIS must be supplemented if "[t]he agency makes substantial changes in the proposed action that are relevant to environmental concerns" or "[t]here are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts."[39]

321.     In determining whether to prepare a supplemental EIS, the agency must take a "hard look at the proffered new information."[40] When new information creates a "seriously different picture of the project from what was previously envisioned," a supplemental EIS is required to allow the public and other government agencies time to react and comment.[41]

322.     There are at least five significant changed circumstances that require preparation of a supplemental EIS: (1) FRA's inexplicable removal of economic viability from the Project's stated purpose; (2) FRA's material change in scope of the proposed agency action; (3) the impact of the COVID-19 pandemic on travel patterns in the U.S.; (4) the recent, catastrophic failure of

---

[39] 40 C.F.R. §§ 1502.9(d)(1)(i)-(ii).

[40] *Hughes River Watershed Conservancy v. Glickman*, 81 F.3d 437, 443 (4th Cir. 1996).

[41] *Id.*

the Texas power grid; and (5) Texas Central's recent admission that costs have ballooned to $30+ billion and the Project will not be privately financed.

**After eliminating reasonable alignment alternatives from consideration, FRA materially changed the Project's purpose.**

323. During the scoping process, FRA assessed nine preliminary alternative alignments to determine whether any could achieve the Project's stated purpose of providing safe, reliable, and *economically viable* HSR transportation between Dallas and Houston. After eliminating eight of the nine alternative alignments, FRA inexplicably removed economic viability from the Project's stated purpose.

324. FRA's removal of economic viability from the Project's purpose after eliminating reasonable alternative alignments constituted a significant changed circumstance. As such, FRA should have prepared a supplemental EIS to reconsider the eliminated alternatives with this revised purpose in mind.

**FRA changed the scope of its proposed action *after* preparing the Draft EIS.**

325. In 2014, FRA published its Notice of Intent to prepare an EIS to evaluate the impacts of constructing and operating Texas Central's proposed HSR. At that time, FRA referred to construction and operation of the Project as the "Proposed Action"—*i.e.*, the major federal action requiring NEPA review.

326. In 2017, FRA published the Draft EIS in which it purportedly evaluated the impacts that may result from the construction and operation of the Project.

327. In 2020, FRA published the Final EIS which purportedly evaluated the impacts that may result from FRA's proposed RPA in order to "to enable effective safety oversight of the operation of a [HSR] system based on the … Shinkansen technology."

328.    Similarly, in the ROD, FRA made clear that it was approving only the RPA, and that it was *not* approving construction or operation of the Project.

329.    FRA's sudden, material change of the scope of its action in the Final EIS constitutes a significant changed circumstance warranting a supplemental EIS.

**The COVID-19 pandemic constitutes a significant changed circumstance.**

330.    The COVID-19 pandemic has decimated the travel industry and upended all notions of what future travel may be. The impact in the United States has been dramatic, as many Americans are now working from home, intercity travel has plummeted, and rail and air travel are a tiny fraction of what they once were.

331.    The future of travel is uncertain, and the degree to which Americans will be willing to travel in a small, enclosed space — such as a high-speed rail car — is unknown. As Metro General Manager Paul Wiedefeld recently put it, "[t]he other issue for us is even what the new normal looks like, particularly with teleworking and some of the things that are going on…. we just can't assume that we would get back to pre-pandemic levels because that [customer] base may just be totally different."[42]

332.    With respect to passenger rail service, Amtrak has been severely impacted by the pandemic, having suspended routes and reduced service on others due to a dramatic decline in demand. Amtrak has acknowledged future ridership will be negatively affected by behavioral issues like teleworking, and is re-thinking appropriate capacity limits. A recent Amtrak survey reveals a reluctance by travelers to use trains in the future. Amtrak now anticipates that ridership

---

[42] Justin George, *Metro budget cuts weekend service, half of bus routes and closes 19 stations amid dire financial forecast*, THE WASHINGTON POST (Nov. 30, 2020).

will be adversely impacted even when the pandemic subsides. Due to these challenges, Amtrak recently requested $1.475 billion in emergency funding.

333.     Metro faces similar challenges. It is proposing the first ever elimination of weekend rail service as the transit agency's financial struggles continue to mount. With a nearly $500 million deficit, Metro is proposing to cut 4,000 positions. Nineteen stations may close as its service is slashed by more than half. Metro had projected nearly $800 million in revenue for the 2020 fiscal year, before COVID-19 struck. Now, Metro predicts revenue of $264 million in 2021 assuming ridership continues to grow.

334.     A dramatic transformation is occurring in the transportation and travel industries due to the unprecedented COVID-19 pandemic. Even if the pandemic ends, ridership might never return to pre-pandemic levels because some work arrangements will have been permanently altered. As such, rail service providers are now planning for the permanently-changed future of travel—including significant revisions to ridership forecasts. The uncertainty of the future of travel and complications arising from the ongoing COVID-19 pandemic constitutes a significant changed circumstance warranting a supplemental EIS.

**The recent disastrous failure of the Texas power grid is a significant changed circumstance.**

335.     While Texas produces and consumes more electricity than any other state overall, it is also the only state that runs a stand-alone, independent electricity grid. Most of the state's power grid — the majority of which is operated by the Electric Reliability Council of Texas ("ERCOT") — cannot connect to other grids when a disaster occurs.

336.     In February 2021, Texas endured a winter storm that plunged large swaths of the state into subfreezing temperatures and overwhelmed the state's electricity infrastructure, causing

massive power outages. Nearly half of the total power generation capacity was offline as weather conditions caused failures in every type of power source: coal, natural gas, wind, and nuclear.

337. During the storm, approximately 46,000 megawatts of power — enough to provide power to 9 million homes on a high-demand day — had to be pulled off the grid.[43] At the peak of the crisis, more than 4.5 million homes across Texas were without power. According to ERCOT's former president, the power grid was "seconds and minutes" away from catastrophic failure that could have left Texans without power for months.[44] At least 57 deaths have been tied to the storm.

338. According to the Final EIS, the Project "would obtain electricity from the statewide grid, managed by [ERCOT], resulting in an overall effect on statewide energy use. The total energy (electrical) demand of the Project, at maximum, is estimated to be 531,867 megawatt hours (MWh) per year." That amounts to an average daily use of 1,457 MWh. By comparison, ERCOT estimates that 1 MWh can fuel the needs of approximately 200 homes per day, meaning the Project would require the energy equivalent of approximately 291,400 homes.

339. In the Final EIS, FRA states that ERCOT projects an increase in electricity demand in Texas to the tune of 489,840 MWh of additional daily generation. But at legislative hearings held to address the recent crisis, the former heads of ERCOT and the Public Utility Commission testified that they do *not* see capacity being added because there is no market for it.

340. Although the purpose of a Final EIS is to anticipate and evaluate impacts that may result from a proposed action, FRA did not analyze whether the Texas power grid could deliver sufficient power to the Project during emergency situations, raising important safety and

---

[43] Jeremy Schwartz, Kiah Collier, and Vianna Davila, *"Power companies get exactly what they want": How Texas repeatedly failed to protect its power grid against extreme weather*, TEXAS TRIBUNE (Feb. 22, 2021).

[44] Erin Douglas, *Texas was "seconds and minutes" away from catastrophic monthslong blackouts, officials say*, TEXAS TRIBUNE (Feb. 18, 2021).

operational issues. Nor did FRA evaluate the Project's impact on the overall availability of power within the grid if no new capacity will be added to account for the Project's increase on demand.

341.　While FRA may have believed an evaluation of the Project's impacts on the Texas power grid during crises or emergency situations to be beyond the reasonable scope of its EIS, that has proven to no longer be the case. The recent, catastrophic failure of the Texas power grid constitutes a significant changed circumstance requiring a Supplemental EIS.

**The Project will cost over $30 billion to construct and will not be privately financed.**

342.　The Project's estimated costs have increased to at least $30 billion, exceeding FRA's estimate in the Final EIS by more than $10 billion. Meanwhile, Texas Central has finally admitted the Project will not be privately financed—a fact hundreds of stakeholders warned FRA about during the Draft EIS comment period. The Project's skyrocketing costs combined with the sudden switch from private to public funding is a significant changed circumstance warranting a supplemental EIS.

**Any of these changed circumstances, standing alone, requires a supplemental EIS.**

343.　Despite the presence and awareness of these significant changed circumstances, FRA has neglected to issue a supplemental EIS and instead has relied on the woefully outdated information in the Final EIS. A supplemental EIS would provide the public and decisionmakers a very different picture of the purported merits of the Project and could lead to a different decision. Defendants' failure to submit a supplemental EIS renders their decision to issue the ROD approving the RPA and Final EIS a violation of NEPA and the APA, arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law.

## ELEVENTH CLAIM FOR RELIEF – VIOLATION OF NEPA

### FRA failed to allow adequate opportunity to submit informed public comment.

344.     Plaintiffs incorporate each of the prior paragraphs by reference.

345.     NEPA promotes "its sweeping commitment" to prevent damage to the environment "by focusing Government and public attention on the environmental effects of proposed agency action."[45] NEPA's mandate to broadly disseminate information "permits the public and other government agencies to react to the effects of a proposed action at a meaningful time."[46]

346.     Public involvement is thus crucial under NEPA. Federal agencies must "[m]ake diligent efforts to involve the public in preparing and implementing their NEPA procedures."[47] Further, federal agencies must hold or sponsor public hearings or meetings whenever appropriate, including when there is "[s]ubstantial environmental controversy concerning the proposed action or substantial interest in holding the hearing," as is the case here.[48]

### FRA failed to notify the public of the location of HC-4 and other portions of the proposed alignment during the scoping process.

347.     The final public scoping meetings occurred in late 2014 and the comment period ended in January 2015. Nearly a year *after* the comment period ended, FRA announced it had selected HC-4 as the southern-one third of the alignment to be carried forward for evaluation in the Draft EIS. Prior to this announcement, FRA had not even mentioned "HC-4" as a potential alignment nor had it disclosed its location during the scoping process. As a result, those persons impacted by the HC-4 alignment were not afforded an opportunity to participate and submit public

---

[45] *Marsh v. Oregon Nat. Res. Council*, 490 U.S. 360, 371 (1989); 42 U.S.C. § 4321.

[46] *Defs. of Wildlife v. N. Carolina Dep't of Transp.*, 762 F.3d 374, 393 (4th Cir. 2014) (citing *Marsh*, 490 U.S. at 371).

[47] 40 C.F.R. § 1506.6(a).

[48] 40 C.F.R. § 1506.6(c); *Brodsky v. U.S. Nuclear Regulatory Comm'n*, 704 F.3d 113, 120 (2d Cir. 2013).

comment regarding its proposed location. FRA's failure in this regard extended to other parts of the alignment along the affected corridor.

**FRA refused to postpone the NPRM hearings until they could be held in person.**

348.    FRA initially scheduled three public hearings on the NPRM to be held in March and April 2020, but the hearings were postponed due to the emergence of COVID-19. Two weeks later, FRA announced it had decided to hold the hearings telephonically. Concerned parties provided FRA numerous good faith reasons why the telephonic hearings should be cancelled or postponed until they could safely be held in person. FRA ignored these concerns and refused to postpone the telephonic hearings.

349.    Defendants' failure to allow adequate opportunity for the public to submit informed comment renders their decision to issue the ROD approving the RPA and Final EIS a violation of NEPA and the APA, arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law.

### TWELFTH CLAIM FOR RELIEF – VIOLATION OF THE APA

**Setting NEPA aside, FRA's decisions were arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.**

350.    Plaintiffs incorporate each of the prior paragraphs by reference.

351.    Even if FRA conceivably has authority for the type of action, findings, and conclusions at issue here, and even if NEPA did not preclude FRA's challenged decisions here, FRA's action, findings, and conclusions violate what may be the ultimate limitation of power secured by the APA. The challenged decisions are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."[49]

---

[49] 5 U.S.C. § 706(2)(A).

352.     Here, FRA undertook a NEPA process for which it had neither authority nor expertise or experience. It scoped and purported to approve a Final EIS, and its evaluation of alternatives, for purposes concerning construction and operation of the Project. Then, FRA purported to use the Final EIS to support not only the RPA, but implementation of the proposed Shinkansen technology "independent of location."

353.     Throughout the process, at literally every stage, FRA made irrational, inexplicable decisions far outside any norm of practice. Ultimately, FRA purported to use the Final EIS to justify a decision about safety, even though the Final EIS did not, and could not, have evaluated the safety concerns at issue in the RPA because the RPA came so late in the process.

354.     Much earlier in the EIS process, there were discussions of alternative routes, but the safety of HSR technology varies little on different routes. Conceivably FRA could use this process to determine (for example) the range of safe shapes for curving tracks for fast trains. Such a determination might be relevant as *one input* to select among different route. But, at most, it is one part of the analysis to identify parameters for scoping and to prepare a Draft EIS, review comments, prepare a Final EIS, and issue a ROD. The great majority of factors for this process lie far outside the FRA's authority, expertise, or experience. Whatever FRA might rationally do, it does not include overseeing this EIS process. In addition, what FRA ultimately did, is irrational.

355.     FRA readily admits its approval of the Final EIS and issuance of the ROD and the RPA amount to final agency action. The action, findings, and conclusions in this case are not "committed to agency discretion by law."[50] FRA enabling legislation does not even authorize what FRA did with the EIS process, much less grant discretion.

---

[50] *Id.* § 701(a).

356. To avoid being arbitrary, capricious, or an abuse of discretion, FRA's action, findings, and conclusions must be anchored in some element of its authority, which they are not. More than that, and in addition to meeting NEPA norms, the administrative process must demonstrate a bare minimum of internal logical consistency. Here it does not, and even if NEPA somehow does not invalidate what FRA did, in any event Defendants violated the APA.

## THIRTEENTH CLAIM FOR RELIEF – VIOLATION OF THE APA

### FRA admits neither the Final EIS nor the ROD can be used to authorize construction or operation of the Project.

357. Plaintiffs incorporate each of the prior paragraphs by reference.

358. The Final EIS purports to evaluate impacts that may result from the RPA "to enable effective safety oversight of the operation of a [HSR] system based on the … Shinkansen technology." In its prior EIS documents, however, FRA expressly stated that it had scoped its EIS to evaluate the impacts that may result from construction and operation of the Project.

359. In the ROD, FRA made clear that it was approving only the RPA, and that it was *not* approving construction or operation of the Project. While somewhat encouraging to learn that FRA finally may have recognized it had been acting far outside its limits and well beyond its expertise, the implications of FRA's statement must be made crystal clear.

360. A proper NEPA evaluation of the impacts that may result from construction and operation of the Project cannot even begin unless and until Texas Central submits its application to STB, the federal agency that recently instructed that "any future request for *construction or operation* will need to be made by application." (emphasis added).

361. Even if the ROD or Final EIS might be used to justify the RPA, neither can be used to circumvent the need to conduct a proper, fresh NEPA analysis at the time Texas Central files a construction application, assuming it ever does so. Likewise, neither can be used to support any

proposal for construction or operation of the Project. Although this relief should be uncontested, Plaintiffs must bring this challenge now to avoid any risk that a later challenge might be barred.

## PRAYER

Plaintiffs respectfully request that the Court grant the following relief:

a. An order declaring the ROD void for all purposes and enjoining any use of it;

b. An order declaring the RPA void for all purposes and enjoining any use of it;

c. In the alternative, an order declaring the ROD void for any purpose other than to support the RPA;

d. In the alternative, and order declaring both the ROD and the Final EIS void for purposes of supporting (in whole or in part) construction or operation of the Project;

e. An injunction enjoining Defendants from commencing any NEPA process for the Project unless and until Texas Central submits its full application to the Surface Transportation Board;

f. In the alternative, an order vacating the ROD and the RPA, with a remand back to Defendants for full and complete compliance with NEPA and its implementing regulations before issuing any Final EIS, or approving any ROD or RPA for the Project;

g. In the alternative, an order vacating the ROD and RPA and instructing Defendants to prepare a supplemental EIS to address and correct all deficiencies in the Final EIS;

h. In the alternative, an order vacating the ROD and RPA and instructing Defendants to prepare a supplemental EIS to evaluate all significant changed circumstances and new information relevant to environmental concerns;

i. In the alternative, an order vacating the ROD and RPA, instructing Defendants to prepare a supplemental EIS to evaluate the significant changed circumstances and new information relevant to environmental concerns;

j. An injunction enjoining Defendants from taking further action concerning the Project or any related HSR project until they comply fully with NEPA and the APA;

k. An award of reasonable attorneys' fees and costs as permitted by the Equal Access to Justice Act, 28 U.S.C. § 2412;

l. An order maintaining jurisdiction over this civil action to ensure Defendants' full compliance with this Court's orders; and

m. Any other relief that the Court determines to be just and appropriate for a full and final judgment with respect to all of Plaintiffs' claims.

Respectfully submitted,

/s/ Blake L. Beckham
Blake L. Beckham
Texas State Bar No. 02016500
Blake@beckham-group.com
THE BECKHAM GROUP P.C.
3400 Carlisle, Suite 550
Dallas, Texas 75204
214-965-9300 (tel.)
214- 965-9301 (fax)

Jim Blackburn
Texas State Bar No. 02388500
jbb@blackburncarter.com
BLACKBURN & CARTER PC
4709 Austin St.
Houston, Texas 77004
713-501-9007 (tel.)

David A. Kahne
Texas State Bar No. 00790129
davidakahne@gmail.com
LAW OFFICE OF DAVID. A KAHNE
P.O. Box 66386
Houston, Texas 77266
713-252-7764 (tel.)

Glenn Sodd
Texas State Bar No. 18820500
Jody@dawsonsodd.com
Clint Schumacher
Texas State Bar No. 24002914
Clint@dawsonsodd.com
DAWSON & SODD, LLP
504 W. 2nd Ave.
Corsicana, Texas 75110
903-872-8181 (tel.)
903-872-2654 (fax)

***ATTORNEYS FOR PLAINTIFFS***